HARBOR INSURANCE COMPANY *v.* JOHN GROPPO, COMMISSIONER OF REVENUE SERVICES (13306)

PETERS, C. J., HEALEY, SHEA, GLASS and COVELLO, Js.

Argued May 11—decision released August 9, 1988

*Ann M. Bogorowski,* with whom, on the brief, was *Charles F. Corcoran III,* for the appellant (plaintiff).

*Carl F. Yeich,* assistant attorney general, with whom, on the brief, were *Joseph I. Lieberman,* attorney general, and *John G. Haines,* assistant attorney general, for the appellee (defendant).

GLASS, J. The sole issue on this appeal is whether General Statutes § 12-210 (a),[1] as applied to the plaintiff, Harbor Insurance Company (Harbor), violates the equal protection clauses of the United States and Connecticut constitutions. Harbor claims that a tax imposed upon it by the defendant, commissioner of revenue services (commissioner), pursuant to § 12-210 (a), denied it equal protection of the laws because: (1) § 12-210 (a) is not rationally related to its revenue raising purpose; (2) Harbor was treated differently than similarly situated insurers; and (3) § 12-210 (a) is constitutionally invalid as a privilege tax.

The parties stipulated to the following facts: Harbor is a California corporation with its principal place of business in Los Angeles, and is authorized to do business in Connecticut. Harbor was admitted as a licensed insurer in Connecticut on April 16, 1982. Prior to becoming a licensed insurer, Harbor had been an authorized surplus line carrier in Connecticut, having been placed on Connecticut's approved list by the Connecticut insurance department on June 3, 1970.[2] All of the

---

[1] "[General Statutes] Sec. 12-210. TAX ON NET DIRECT PREMIUMS OF NON-RESIDENT AND FOREIGN COMPANIES. (a) Each newly licensed insurance company incorporated by or organized under the laws of any other state or foreign government shall pay to the commissioner of revenue services, within forty-five days of the effective date of such company's initial license to transact business in this state, a tax on the net direct premiums received by such company in the next five preceding calendar years from policies written on property or risks located or resident in this state, except ocean marine insurance, at the rate in effect for each such calendar year."

[2] Surplus or excess line insurance is insurance on property or risks that standard line insurers licensed in this state have chosen not to insure because

insurance business in Connecticut that was written by Harbor from 1977 through April 16, 1982, was surplus line business and had been legally written through licensed surplus line brokers in Connecticut. From June 3, 1970, until Harbor was licensed on April 16, 1982, excess line brokers licensed by the insurance commissioner pursuant to General Statutes § 38-78[3] had

they are especially risky or expensive. A surplus line insurer is not licensed in the jurisdiction in which the risk is located, but is eligible by law to insure risks under certain conditions.

[3] "[General Statutes] Sec. 38-78. EXCESS LINE BROKER'S LICENSE. REGULATIONS RE UNAUTHORIZED IINSURERS. (a) Notwithstanding the provisions of section 38-70, the commissioner may issue an excess line broker's license to any person, firm, association or corporation who or which is domiciled and maintains an office in this state and is licensed as an insurance agent or insurance broker under section 38-72, authorizing such licensee to procure, from insurers not authorized to transact business in this state, subject to the restrictions herein provided, policies of insurance against loss from any contingency as provided by the insurance laws of this state, except any insurance coverage which can be placed through a residual market mechanism, as defined in subsection (x) of section 38-501.

"(b) The commissioner may by regulation: (1) Establish such proper standards as he may deem necessary to guide excess line brokers procuring any such policy of insurance, as is permitted under subsection (a) of this section, from any such unauthorized insurer; (2) require any unauthorized insurer from which any excess line broker has procured or intends to procure any policy of insurance, as is permitted under subsection (a) of this section, to file with him such evidence and in such form as he may prescribe so as to enable him to establish the financial stability, qualifications and general suitability of such unauthorized insurer to issue any policy of insurance through any excess line broker, under this section; and (3) establish such reasonable filing fees as may be necessary to defray the cost to him of examining evidence filed with him by an unauthorized insurer either voluntarily or pursuant to the provisions of this section.

"(c) The commissioner, after reasonable notice to and hearing of any holder of such a license, may suspend or revoke such license for cause shown. In addition to or in lieu of such suspension or revocation the commissioner may impose a fine not to exceed one thousand dollars. Such hearings may be held by the commissioner or any person designated by the commissioner. Whenever a person other than the commissioner acts as the hearing officer, he shall submit to the commissioner a memorandum of his findings and recommendations upon which the commissioner may base his decision. Any person aggrieved by the action of the commissioner in revoking, suspending, or refusing to grant or reissue a license or in imposing a fine may

been authorized by the insurance commissioner to procure insurance from Harbor for insureds located in Connecticut. Pursuant to General Statutes § 38-84, a tax of 4 percent of the gross premiums on said business was required to be paid to the state of Connecticut by the surplus line brokers who had handled the placement of Harbor's surplus line policies. Harbor was not required to pay any tax to the state of Connecticut from 1977 through April 16, 1982, for any policies procured by such licensed excess brokers.

Subsequent to Harbor's being licensed by the insurance commissioner on April 16, 1982, the defendant commissioner, pursuant to § 12-210 (a), assessed a gross premium tax of 2.35 percent on Harbor's surplus line business in Connecticut for the five years preceding April 16, 1982. A company newly admitted as a licensed insurer in Connecticut that had done no prior business in Connecticut would not be assessed any tax under § 12-210 (a) upon its admission, and would be subject only to a $150 filing fee after its admission as a licensed insurer in Connecticut.

Harbor challenged the assessment of the tax, but it was affirmed by the commissioner on May 17, 1986. Harbor filed an appeal in the Superior Court, claiming that the tax assessment was improper and should be set aside. The trial court rendered judgment upholding the tax assessment and dismissing Harbor's appeal. On October 30, 1987, Harbor filed an appeal in the Appellate Court, and on December 3, 1987, pursuant to Practice Book § 4023, the appeal was transferred to this court. We find no error.

At the outset, we note the following principles of constitutional equal protection analysis: "When a statute

appeal therefrom in accordance with the provisions of section 4-183, except venue for such appeal shall be in the judicial district of Hartford-New Britain. Appeals under this section shall be privileged in respect to the order of trial assignment."

is challenged on equal protection grounds, whether under the United States constitution or the Connecticut constitution, the reviewing court must first determine the standard by which the challenged statute's constitutional validity will be determined. If, in distinguishing between classes, the statute either intrudes on the exercise of a fundamental right or burdens a suspect class of persons, the court will apply a strict scrutiny standard wherein the state must demonstrate that the challenged statute is necessary to the achievement of a compelling state interest. *In re Griffiths*, 413 U.S. 717, 721, 93 S. Ct. 2851, 37 L. Ed. 2d 910 (1973); *San Antonio Independent School District* v. *Rodriguez*, 411 U.S. 1, 30, 93 S. Ct. 1278, 36 L. Ed. 2d 16, reh. denied, 411 U.S. 959, 93 S. Ct. 1919, 36 L. Ed. 2d 418 (1973); *Eisenstadt* v. *Baird*, 405 U.S. 438, 447, 92 S. Ct. 1029, 31 L. Ed. 2d 349 (1972); *Harper* v. *Virginia State Board of Elections*, 383 U.S. 663, 667, 86 S. Ct. 1079, 16 L. Ed. 2d 169 (1966). If the statute does not touch upon either a fundamental right or a suspect class, its classification need only be rationally related to some legitimate government purpose in order to withstand an equal protection challenge. *Trimble* v. *Gordon*, 430 U.S. 762, 767, 97 S. Ct. 1459, 52 L. Ed. 2d 31 (1977); *Massachusetts Board of Retirement* v. *Murgia*, 427 U.S. 307, 312, 96 S. Ct. 2562, 49 L. Ed. 2d 520 (1976). . . .

"Under the rational basis test, '[t]he court's function . . . is to decide whether the purpose of the legislation is a legitimate one and whether the particular enactment is designed to accomplish that purpose in a fair and reasonable way.' *Pierce* v. *Albanese*, 144 Conn. 241, 249, 129 A.2d 606, appeal dismissed, 355 U.S. 15, 78 S. Ct. 36, 2 L. Ed. 2d 21 (1957); see *New Orleans* v. *Dukes*, 427 U.S. 297, 303, 96 S. Ct. 2513, 49 L. Ed. 2d 511 (1976); *McGowan* v. *Maryland*, 366 U.S. 420, 425, 81 S. Ct. 1101, 6 L. Ed. 2d 393 (1961); *Caldor's, Inc.* v. *Bedding Barn, Inc.*, 177 Conn. 304,

315, 417 A.2d 343 (1979). For our purposes here the test is the same under both the federal and state constitutions. *Caldor's, Inc.* v. *Bedding Barn, Inc.*, supra, 314; *Horton* v. *Meskill,* 172 Conn. 615, 639, 376 A.2d 359 (1977)." *Ryszkiewicz* v. *New Britain,* 193 Conn. 589, 596–99, 479 A.2d 793 (1984).

Moreover, there is "the established principle that those who challenge the constitutionality of a state statute bear the heavy burden of demonstrating beyond a reasonable doubt that the presumption of its validity has been overcome. See, e.g., *Kellems* v. *Brown,* 163 Conn. 478, 486, 313 A.2d 53 (1972), appeal dismissed, 409 U.S. 1099, 93 S. Ct. 911, 34 L. Ed. 2d 678 (1973); *Adams* v. *Rubinow,* 157 Conn. 150, 152–53, 251 A.2d 49 (1968). A party challenging a tax statute on the grounds of equal protection bears an even greater burden because '[a]s this court emphasized in *Kellems* v. *Brown,* supra, 487, quoting *Madden* v. *Kentucky,* 309 U.S. 83, 88, 60 S. Ct. 406, 84 L. Ed. 590 [1940], " 'in taxation, even more than in other fields, legislatures possess the greatest freedom in classification. Since the members of a legislature necessarily enjoy a familiarity with local conditions which [the United States Supreme] Court cannot have, the presumption of constitutionality can be overcome only by the most explicit demonstration that a classification is a hostile and oppressive discrimination against particular persons and classes. The burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it.' " ' *Miller* v. *Heffernan,* [173 Conn. 506, 509–10, 378 A.2d 572 (1977), appeal dismissed, 434 U.S. 1057, 98 S. Ct. 1226, 55 L. Ed. 2d 758 (1978)]. Nonetheless, even for the purposes of taxation, the legislature does not have an unlimited power to create classifications. The classifications that it selects cannot be arbitrary but ' "must rest upon some ground of difference having a fair and substantial rela-

tion to the object of the legislation." ' (Citations omitted.) *Allied Stores* v. *Bowers,* 358 U.S. 522, 527, 79 S. Ct. 437, 3 L. Ed. 2d 480 (1959); see *United Illuminating Co.* v. *New Haven,* 179 Conn. 627, 636–37, 427 A.2d 830 (1980); *Kellems* v. *Brown,* supra, 490. Recognizing that any plan of taxation necessarily has some discriminatory impact; *San Antonio Independent School District* v. *Rodriguez,* [supra, 41]; *United Illuminating Co.* v. *New Haven,* supra, 641; we have previously stated the operative test for the validity of a tax statute to be the following: ' "As long as some *conceivable* rational basis for the difference exists, 'a classification is not offensive merely because it is not made with mathematical nicety.' " ' (Emphasis in original.) (Citations omitted.) *United Illuminating Co.* v. *New Haven,* supra, 640–41." *Gunther* v. *Dubno,* 195 Conn. 284, 291–92, 487 A.2d 1080 (1985).

We find that § 12-210 is rationally related to its legitimate purpose of raising revenue. Section 12-210 is designed to tax insurers on business previously written on Connecticut property or risks, once they submit to the jurisdiction of the state and choose to become licensed. In construing an analogous tax, the United States Supreme Court recently stated that a legitimate goal of taxation is to "compensate the state for revenue lost when residents purchase out-of-state goods for use within the State." *D. H. Holmes Co.* v. *McNamara,* 486 U.S. 24, 108 S. Ct. 1619, 1624, 100 L. Ed. 2d 21 (1988).

Harbor asserts that the tax is arbitrary and irrational, and relies on cases in which a court has determined that a taxing scheme violates the equal protection clause. See *Metropolitan Life Ins. Co.* v. *Ward,* 470 U.S. 869, 105 S. Ct. 1676, 84 L. Ed. 2d 751, reh. denied, 471 U.S. 1120, 105 S. Ct. 2370, 86 L. Ed. 2d 269 (1985); *Penn Mutual Life Ins. Co.* v. *Department of Licensing & Regulation,* 162 Mich. App. 123, 412 N.W.2d 668 (1987),

appeal denied, 429 Mich. 871 (1987); *State* v. *American Bankers Ins. Co.,* 374 N.W.2d 609 (S.D. 1985). These cases, however, generally involve taxes that burden interstate commerce by the preferential treatment of a domestic insurer or business.

In *Ward,* the United States Supreme Court invalidated an Alabama statute that taxed domestic insurers' gross premiums at 1 percent, and foreign insurers' premiums at 3 to 4 percent, absent capital investment in Alabama. No amount of capital investment under Alabama's statutory scheme could reduce a foreign insurer's tax burden to that of a domestic insurer. In *Penn Mutual Life Ins. Co.,* the Michigan Court of Appeals invalidated a Michigan statute that imposed a 2 to 3 percent tax on admitted foreign insurers depending on the type of insurance sold, while imposing a less burdensome 2.35 percent income tax on domestic insurers. Finally, in *American Bankers Ins. Co.,* the South Dakota Supreme Court held that a South Dakota tax statute violated the equal protection clause because the tax imposed a higher rate on excess line insurers than it did on domestic insurers. These cases are distinguishable from the present case because they involve the question of a discriminatory *tax rate* between domestic and foreign insurers. There is no claim before this court that the *rate* at which Harbor's tax liability was assessed was in any way constitutionally impermissible.

In further support of its argument that § 12-210 is not rationally related to its revenue raising purpose, Harbor argues that recent United States Supreme Court cases have adopted a "heightened" rational basis test, which, if applied in this case, would result in a finding of no rational basis for the tax. Harbor relies on *Metropolitan Life Ins. Co.* v. *Ward,* supra, *Cleburne* v. *Cleburne Living Center,* 473 U.S. 432, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985), and *Coburn* v. *Agustin,* 627

F. Sup. 983 (D. Kan. 1985), for this assertion. As noted in *Coburn* v. *Agustin,* supra, 990, the United States Supreme Court, however, "has not officially articulated a new [rational basis] test," and we decline to follow the lead of the District Court of Appeals in applying such a test until it is formally adopted by the United States Supreme Court.[4]

Next, Harbor argues that the distinction drawn between it and insurers that did not have a surplus line business in Connnecticut prior to becoming licensed in Connecticut is discriminatory, because similarily situated insurers are treated differently. Section 12-210 (a), however, requires only insurers that previously have been permitted to insure certain property and risks in Connecticut, upon becoming licensed in this state, to pay a tax on the business that they have previously conducted. The two classes of insurers simply are not similar: one has written business in this state and has enjoyed the benefits of writing such business, the other has not written any business in this state and has received no Connecticut business benefits. Moreover, Harbor has not referred us to any case holding unconstitutional, on an equal protection analysis, a state taxing scheme recognizing this argument.

Harbor suggests that for the purposes of an equal protection analysis, the relevant comparison is between

---

[4] Were we to apply a heightened rational basis test, we conclude nonetheless that General Statutes § 12-210 (a) withstands constitutional scrutiny. Harbor argues that a heightened rational basis analysis would entail an examination of the actual relationship between the legislative goals and means by considering the "practical operation" of the challenged statute. In this vein, Harbor argues that the long run effect of § 12-210 (a) will be to decrease revenues by creating a disincentive for excess line insurers to become admitted in Connecticut. Harbor has set forth no facts indicating that the statute will have this effect. We also note, however, that if Harbor's hypothesis is correct, the state has a legitimate goal in preserving the surplus line insurance market, and this would allow us to uphold the statute.

all newly admitted insurers, irrespective of whether any members of the class have previously insured risks in Connecticut, because § 12-210 (a) becomes effective upon admission in the state as a licensed insurer, rather than prior to becoming licensed. We find this distinction unavailing. The state has no means to collect any taxes from an excess line insurer until it submits to the jurisdiction of the state.

In support of its argument, Harbor also relies on recent United States Supreme Court cases in which that court invalidated statutes drawing distinctions on the basis of past relationships or activities. For example, in *Williams* v. *Vermont,* 472 U.S. 14, 105 S. Ct. 2465, 86 L. Ed. 2d 11 (1985), the court invalidated a Vermont use tax collected by Vermont when cars were registered in the state. The tax was not imposed if the car was purchased in Vermont and a sales tax was paid. The tax was also reduced by the amount of any sales or use tax paid to another state if that state afforded a similar credit. The credit was only available if the registrant was a Vermont resident at the time he paid the taxes. The court held that there was no relevant distinction between motor vehicle registrants who purchased their cars out-of-state while they were Vermont residents, and those who established residence in Vermont after buying a car elsewhere. Id., 24–25.

We find that the past relationship noted in *Williams* is distinguishable from the past relationship Harbor has with Connecticut. In *Williams,* state residents received a benefit that was unavailable to other state residents who had purchased a car out-of-state prior to establishing residence. In the present case, Harbor is required to pay a tax, upon admission as a licensed insurer, not only because it was previously a nonresident but because it previously received earnings attributable to insurance premiums previously recovered from within this state.

Finally, Harbor argues that even if the tax is construed to be a privilege tax, it is unconstitutional on equal protection grounds. This claim is premised upon our concluding either that Harbor is similarly situated with newly admitted insurers who have never conducted business in Connecticut, or that § 12-210 (a) is not rationally related to the value of the privilege granted. Harbor's arguments are no different from those we have rejected above and we need not address them further.

There is no error.

In this opinion the other justices concurred.