## DeForest H. Benjamin, Jr., et al. *v.*
## John M. Bailey et al.
### (14968)

Peters, C. J., and Borden, Berdon, Katz and Palmer, Js.

Argued April 26—decision released July 25, 1995

*Wesley W. Horton*, with whom were *Christy Scott, Gregory J. Miller, Mark K. Benenson* and, on the brief, *Michael S. Taylor, John A. Reed, Joseph M. Busher* and *Jennifer B. Cona*, legal interns, for the appellants-appellees (plaintiffs).

*Richard Blumenthal*, attorney general, with whom were *Robert F. Vacchelli, Ronald E. Naves, Jr.*, and *Gregory T. D'Auria*, assistant attorneys general, and *Harry D. Weller*, assistant state's attorney, for the appellees-appellants (defendants).

*Serge G. Mihaly* and *Robert Dowlut*, pro hac vice, filed a brief for the Firearms Civil Rights Legal Defense Fund as amicus curiae.

*David W. Cooney, Douglas Hammond, Dennis A. Henigan*, pro hac vice, and *Mark D. Polston*, pro hac vice, filed a brief for The Center To Prevent Handgun Violence et al. as amici curiae.

PETERS, C. J. The principal question in this appeal is whether the statutes banning the sale, transfer or possession of assault weapons, General Statutes §§ 53-202a through 53-202k,[1] violate the right to bear arms guaranteed by article first, § 15, of the state constitution.[2] In November, 1993, the plaintiffs, DeForest H. Benjamin, Jr., Robert A. Suprenant, Bertcelis E. Morales, Michelle R. Palmer, Bradford B. Palmer, Frank D'Andrea, Bruce E. Kaufman and Navegar, Inc., doing business as Intratec, a foreign corporation, initiated this declaratory judgment action[3] against John M. Bailey, chief state's attorney, Frank Maco, state's attorney for Litchfield, and Nicholas Cioffi, the commissioner of public safety. Following a trial to the court, the court determined that the statutory ban on assault weapons does not violate the state constitutional right to bear arms, the state constitutional right to equal protection of the laws or the state constitutional prohibition of bills of attainder. The court, however, believing a narrowing construction to be necessary to prevent the statutes from being vague in violation of the constitutional right to due process, excised certain words from the statutory enumeration of proscribed weapons. The plaintiffs appealed and the defendants cross appealed from the trial court's ruling directly to this court pursuant to General Statutes § 51-199 (b) (2). We agree with the trial court that the ban on assault weapons is constitutionally permissible. We disagree with the trial court that certain components of the legis-

---

[1] The assault weapons ban was enacted into law by Public Acts 1993, No. 93-306, and became effective on October 1, 1993.

[2] The constitution of Connecticut, article first, § 15, provides: "Every citizen has a right to bear arms in defense of himself and the state."

[3] Practice Book § 389 provides: "The court will, in cases not herein excepted, render declaratory judgments as to the existence or nonexistence (a) of any right, power, privilege or immunity; or (b) of any fact upon which the existence or nonexistence of such right, power, privilege or immunity does or may depend, whether such right, power, privilege or immunity now exists or will arise in the future."

lation are unconstitutionally vague for purposes of this declaratory judgment action. Accordingly, we affirm in part, reverse in part and remand with direction to render judgment in favor of the defendants.

The trial court found the following facts. Although assault weapons do not comprise the majority of the weapons that are seized by law enforcement officials, the number of assault weapons being seized is rising steadily. Assault weapons "have appeared more frequently as a risk factor to police officers on the street, and to innocent victims in densely-populated areas." In this regard, the court noted the testimony of Chief Thomas Sweeney of the Bridgeport police department, who described two separate crime scenes at which a total of seventy-six spent rounds from assault weapons had been found. Sweeney also testified to situations in which assault weapons had been used against police officers, and another in which an apparently unintended victim had been killed by a bullet fired from an assault weapon. Similarly, the court noted the testimony of Major John Bardelli of the state police, who testified concerning the investigation into the murder of a state trooper killed by a burglar using a type of assault weapon proscribed by the statutory ban.

In relation to the specific legislation at issue, the trial court determined that "there are many firearms [that] fit the general designation of 'assault weapons,' and [that] are virtually identical to the banned weapons, but [that] do not appear on the list [of proscribed weapons]." Copies of the firearms listed in General Statutes § 53-202a may be found in this country and abroad. The court further found that it is regular practice in the firearms industry to market weapons by changing their numerical designation, name and accessories. The trial court, however, discredited evidence presented by the plaintiffs' expert witnesses, who had testified that certain firearms listed in § 53-202a could not be readily

identified and that the weapons banned by the statute were appropriate for self-defense. Other facts will be related as necessary.

On the basis of these factual findings, the trial court addressed the plaintiffs' claims in three separate analytic categories. First, the court concluded that the ban on assault weapons represents a reasonable exercise of the state's police power. As a result, the court determined, the legislation does not unconstitutionally infringe the right to bear arms, principles of due process or equal protection of the laws. Second, applying the tripartite test enunciated in *Nixon* v. *Administrator of General Services*, 433 U.S. 425, 473–84, 97 S. Ct. 2777, 53 L. Ed. 2d 867 (1977), the court determined that the legislation is not an unconstitutional bill of attainder. Third, the court determined that the term "type," used in three places in the portion of § 53-202a that lists the proscribed weapons,[4] has no generally

---

[4] General Statutes § 53-202a provides: "ASSAULT WEAPONS: DEFINITION. (a) As used in this section and sections 53-202b to 53-202k, inclusive, and subsection (h) of section 53a-46a, 'assault weapon' means:

"(1) Any selective-fire firearm capable of fully automatic, semiautomatic or burst fire at the option of the user or any of the following specified semiautomatic firearms: Algimec Agmi; Armalite AR-180; Australian Automatic Arms SAP Pistol; Auto-Ordnance Thompson *type*; Avtomat Kalashnikov AK-47 *type*; Barrett Light-Fifty model 82A1; Beretta AR-70; Bushmaster Auto Rifle and Auto Pistol; Calico models M-900, M-950 and 100-P; Chartered Industries of Singapore SR-88; Colt AR-15 and Sporter; Daewoo K-1, K-2, Max-1 and Max-2; Encom MK-IV, MP-9 and MP-45; Fabrique Nationale FN/FAL, FN/LAR, or FN/FNC; FAMAS MAS 223; Feather AT-9 and Mini-AT; Federal XC-900 and XC-450; Franchi SPAS-12 and LAW-12; Galil AR and ARM; Goncz High-Tech Carbine and High-Tech Long Pistol; Heckler & Koch HK-91, HK-93, HK-94 and SP-89; Holmes MP-83; MAC-10, MAC-11 and MAC-11 Carbine *type*; Intratec TEC-9 and Scorpion; Iver Johnson Enforcer model 3000; Ruger Mini-14/5F folding stock model only; Scarab Skorpion; SIG 57 AMT and 500 series; Spectre Auto Carbine and Auto Pistol; Springfield Armory BM59, SAR-48 and G-3; Sterling MK-6 and MK-7; Steyr AUG; Street Sweeper and Striker 12 revolving cylinder shotguns; USAS-12; UZI Carbine, Mini-Carbine and Pistol; Weaver Arms Nighthawk; Wilkinson 'Linda' Pistol;

ascertainable meaning in the firearms industry that would be readily understood by members of the general public possessing ordinary intelligence. The court thereafter determined from the legislative history that the designation of the Avtomat Kalashnikov AK-47 (AK-47) weapon and the MAC-10, MAC-11 and MAC-11 Carbine weapons had independent meaning in the absence of the word "type," but that the designation of the Auto-Ordnance Thompson weapon had no such independent meaning without the word "type" and therefore could not be narrowed as a matter of statutory construction. Accordingly, to save the legislation from unconstitutional vagueness, the court deleted the word "type" following AK-47 and MAC-10, MAC-11 and MAC-11 Carbine and the phrase "Auto-Ordnance Thompson type" from the list of proscribed weapons.

On appeal, the plaintiffs challenge the trial court's rulings with respect to the right to bear arms, the right to equal protection of the laws and the prohibition of bills of attainder. The plaintiffs also assert that the trial court improperly determined that the statute listing the proscribed weapons was not vague as a whole or, in the alternative, that the court improperly determined that the vague portions of the statute could be severed in order to prevent the entire statute from being invalidated. The defendants, on the other hand, maintain that, with the exception of the vagueness issue, the trial court's judgment should be affirmed. With respect to vagueness, the defendants assert that the trial court improperly determined that certain portions of the stat-

---

"(2) A part or combination of parts designed or intended to convert a firearm into an assault weapon, or any combination of parts from which an assault weapon may be rapidly assembled if those parts are in the possession or under the control of the same person.

"(b) As used in this section and sections 53-202b to 53-202k, inclusive, and subsection (h) of section 53a-46a, the term 'assault weapon' does not include any firearm modified to render it permanently inoperable." (Emphasis added.)

ute fail to meet the standard applicable to a facial vagueness challenge. We agree with the defendants on each issue.[5]

## I

We first consider the propriety of the statutory ban on assault weapons under article first, § 15, of the state constitution. Although, in our prior opinions, we have referred to this provision in passing, we have not previously had occasion to explore thoroughly the contours of the state constitutional right to bear arms. See *Superintendent of Police* v. *Freedom of Information Commission*, 222 Conn. 621, 629–30, 609 A.2d 998 (1992); *State* v. *Bailey*, 209 Conn. 322, 346, 551 A.2d 1206 (1988); *State* v. *Anonymous*, 179 Conn. 516, 519–21, 427 A.2d 403 (1980); see also *State* v. *Banta*, 15 Conn. App. 161, 184, 544 A.2d 1266, cert. denied, 209 Conn. 815, 550 A.2d 1086 (1988).

The plaintiffs contend that the statutory ban on assault weapons should be declared unconstitutional because it fails to satisfy "strict scrutiny." The plaintiffs' contention involves a three step analysis. First, relying on language from *Horton* v. *Meskill*, 172 Conn. 615, 640–42, 376 A.2d 359 (1977) (*Horton I*) (state financing system for public education violates state con-

---

[5] The defendants also argue that the plaintiffs lack standing to pursue a claim under article first, § 15. The defendants predicate their argument on a purported finding of the trial court that the plaintiffs' possession of proscribed weapons was unrelated to self-defense. Even if the defendants are correct that the trial court made such a finding, however, we need not dwell on this point, because the defendants do not contest the plaintiffs' standing to maintain the other claims raised by this appeal concerning the constitutionality of the assault weapons ban. "[W]here, as here, the [plaintiffs] have standing to raise certain issues pertaining to the controversy, this court, in matters of significant public moment where the public interest would best be served by a dispersal of all constitutional clouds over the act in question, will exercise [its] discretion and decide all closely related issues." *Caldor's, Inc.* v. *Bedding Barn, Inc.*, 177 Conn. 304, 319–20, 417 A.2d 343 (1979); *Gentile* v. *Altermatt*, 169 Conn. 267, 281, 363 A.2d 1 (1975).

stitutional right to equal protection), the plaintiffs assert that because the right to bear arms is one of the rights articulated in article first of the state constitution, that right must be deemed "fundamental." Second, because the right at issue is "fundamental," the plaintiffs maintain, citing *Daly* v. *DelPonte*, 225 Conn. 499, 513, 624 A.2d 876 (1993) (classification by physical disability unconstitutional), that any infringement on the right must be subjected to strict scrutiny analysis. Finally, applying the strict scrutiny test, the plaintiffs argue that the statutory ban on assault weapons is not narrowly tailored to effectuate a compelling government interest.

By phrasing their arguments in this manner, however, the plaintiffs have glossed over the crucial first step in the constitutional analysis. Application of a particular standard of judicial scrutiny presupposes the existence of an injury to a constitutionally protected interest. Only after the injury has been identified can analysis proceed to the inquiry of "whether a [sufficient] governmental interest justifies the infliction of that injury." *Adarand Constructors, Inc.* v. *Pena*,    U.S.    , 115 S. Ct. 2097, 2114, 132 L. Ed. 2d 158 (1995). Questions concerning the level of judicial scrutiny to be applied in a constitutional challenge, therefore, presuppose a judicial determination that a constitutionally protected interest has been infringed.

Our case law demonstrates the importance of specific identification of the constitutional right that is at issue. In *Campbell* v. *Board of Education*, 193 Conn. 93, 475 A.2d 289 (1984), for example, we addressed a challenge to a school board policy that, as sanctions for nonattendance, imposed reductions in marking period grades upon high school students. The plaintiff in *Campbell* claimed that, in light of *Horton I*, which had characterized the right to public education as a fundamental constitutional right, the constitutionality of

the school board's policy had to be reviewed under strict scrutiny analysis. We determined, however, that the plaintiff's claim did not fall within the scope of the specific constitutionally protected interest recognized by *Horton I*. The heightened scrutiny that would be applicable to the infringement of such a constitutional interest, therefore, was not warranted. *Campbell* v. *Board of Education*, supra, 104–105; see also *St. John's Roman Catholic Church Corp.* v. *Darien*, 149 Conn. 712, 720, 184 A.2d 42 (1962) (zoning regulations restricting location of parochial school do not infringe free exercise of religion under article first, § 3, so no heightened scrutiny required). Although we did analyze the grading policy under the rational basis test, such scrutiny was compelled by the substantive due process requirement that all government acts be minimally rational, rather than by any requirement stemming from the education guarantee. *Campbell* v. *Board of Education*, supra, 105–106.

Before we consider whether violations of article first, § 15, must be strictly scrutinized, therefore, we must decide whether this case involves an infringement on a constitutionally protected interest. To do so, we must define the boundaries of the right invoked. Only if we were to conclude that the statute infringes on an interest in bearing arms that is protected by the state constitution would we have to decide what level of justification the state must proffer to support such an infringement and whether the state has satisfied that burden in this case.

Our analysis of rights independently invoked under the state constitution proceeds along well established guidelines. "In order to construe the contours of our state constitution and reach reasoned and principled results, the following tools of analysis should be considered to the extent applicable: (1) the textual approach . . . (2) holdings and dicta of this court, and

the Appellate Court . . . (3) federal precedent . . . (4) sister state decisions or sibling approach . . . (5) the historical approach, including the historical constitutional setting and the debates of the framers . . . and (6) economic/sociological considerations. . . .'' (Citations omitted.) *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992).

The language of our constitution provides that ''[e]very citizen has a right to bears arms *in defense of himself and the state.*'' (Emphasis added.) Conn. Const., art. I, § 15. The limiting language of the provision may be understood to establish two related principles. First, it demonstrates that the bearing of arms is not valued in and of itself, but only as a means to particular ends. Second, it clearly indicates what purposes are *not* accorded explicit constitutional protection: the bearing of arms for any purpose other than defense of one's self or the state.[6]

In this connection, the textual link between the right to bear arms and its enunciated purpose itself suggests a limitation on the nature and scope of the constitu-

---

[6] Article first, § 15, like two other provisions in the state bill of rights, limits the right conferred to ''citizens.'' See Conn. Const., art. I, § 4 (''[e]very citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty''), and § 14 (''[t]he citizens have a right, in a peaceable manner, to assemble for their common good, and to apply to those invested with the powers of government, for redress of grievances, or other proper purposes, by petition, address or remonstrance''). In *State* v. *Sinchuk*, 96 Conn. 605, 610–15, 115 A. 33 (1921), we held that these provisions by their express terms do not apply to aliens. We have no occasion to revisit that decision today or otherwise to define the term ''citizen'' for purposes of state constitutional analysis. Accordingly, we reserve the question whether a statute such as General Statutes § 53a-217, which criminalizes the possession of *any* firearm by a convicted felon, infringes on a constitutional interest protected by article first, § 15. Compare *People* v. *Blue*, 190 Colo. 95, 103, 544 P.2d 385 (1975) (felon in possession statute reasonably regulates right to bear arms), with *State* v. *Smith*, 132 N.H. 756, 758, 571 A.2d 279 (1990) (felon in possession statute infringes right to bear arms but passes strict scrutiny).

tional right. The common law principle permitting one to use deadly force in self-defense has long been restricted by the general rule of reason. See generally W. LaFave & A. Scott, Criminal Law (2d Ed. 1986) § 5.7 (a); see also General Statutes § 53a-18 (right to use deadly force only where person reasonably believes it necessary to protect self from deadly force or great bodily harm). Thus, the constitutional text embodies a rule of reason, rather than an absolute.

To the extent that we previously have construed article first, § 15, we have indicated that it permits reasonable regulation of the right to bear arms. See *State v. Bailey*, supra, 209 Conn. 346 ("[i]t is beyond serious dispute that the legislature has the authority to place reasonable restrictions on a citizen's right to bear arms"); see also *State v. Banta*, supra, 15 Conn. App. 184 ("similar constitutional provisions in other states have been repeatedly interpreted to be subject to reasonable limitation"). Our precedents, however, have not clarified what is protected by the right to bear arms in the first instance.

Both the explicit textual limitations and our precedents persuade us that the constitution protects each citizen's right to possess a weapon of reasonably sufficient firepower to be effective for self-defense.[7] The constitution does *not* guarantee the right to possess any weapon of the individual's choosing for use in self-defense. We conclude, therefore, that as long as our citizens have available to them some types of weapons that are adequate reasonably to vindicate the right to bear arms in self-defense, the state may proscribe the

---

[7] None of the plaintiffs alleged a constitutional interest in the bearing of arms to defend the state. Accordingly, we have no occasion to decide whether a different analysis would obtain if such an interest were shown to exist. Cf. *People v. Brown*, 253 Mich. 537, 540, 235 N.W. 245 (1931) (existence of state National Guard vitiates individual right to bear arms in defense of state).

possession of other weapons without infringing on article first, § 15.

Our structural approach to article first, § 15, finds support in federal precedent. The United States Supreme Court, interpreting the second amendment, has recognized the need to construe the federal right to bear arms in light of its textual limitations.[8] See *United States* v. *Miller,* 307 U.S. 174, 178, 59 S. Ct. 816, 83 L. Ed. 1206 (1939) (second amendment not implicated "[i]n the absence of any evidence tending to show that the possession or use of a [particular firearm] has some reasonable relationship to the preservation or efficiency of a well regulated militia"); see also *Lewis* v. *United States,* 445 U.S. 55, 65 n.8, 100 S. Ct. 915, 63 L. Ed. 2d 198 (1980); *Miller* v. *Texas,* 153 U.S. 535, 538, 14 S. Ct. 874, 38 L. Ed. 812 (1894) (second amendment not applicable to states through fourteenth amendment); J. Ely, Democracy and Distrust (1980) p. 95 ("the framers and ratifiers [of the second amendment] apparently opted against leaving to the future the attribution of purposes, choosing instead explicitly to legislate the goal in terms of which the provision was to be interpreted"). Although some constitutional scholars recently have questioned the court's conception of the "militia" to which the second amendment refers, even their arguments implicitly recognize the need to interpret the right in terms of the amendment's preamble. See, e.g., A. Amar, "The Bill of Rights as a Constitution," 100 Yale L.J. 1131, 1162–73 (1991) (arguing that "the people" as a whole constitute militia to which second amendment refers); S. Levinson, "The Embarrassing Second Amendment," 99 Yale L.J. 637, 646–47 (1989) ("[t]here is strong evidence that 'militia' refers to all of the people, or at least all of those

---

[8] The second amendment to the United States constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

treated as full citizens of the community"); and see D. Kates, Jr., "The Second Amendment: A Dialogue," 49 Law & Contemp. Probs. 143, 145–46 (Winter 1986) (suggesting that even personal right to bear arms under second amendment would be subject to reasonable regulation). Federal precedent otherwise adds little to our analysis, because the text of the second amendment differs significantly from article first, § 15.

Our interpretation of our constitutional provision regarding the right to bear arms also is consistent with the precedents of our sister states. State courts that have addressed the question under their respective constitutions[9] overwhelmingly have recognized that the right is not infringed by reasonable regulation by the state in the exercise of its police power to protect the health, safety and morals of the citizenry. See *Hyde*

[9] The text of the constitutional provisions that were interpreted by these cases may be grouped into four categories. The first category contains provisions that for all relevant purposes are indistinguishable from the language of article first, § 15. See Ala. Const., art. I, § 26; Ind. Const., art. I, § 32; Mich. Const., art. I, § 6; Ohio Const., art. I, § 4; Or. Const., art. I, § 27; Wyo. Const., art. I, § 24.

The second category contains provisions that define the list of protected uses more expansively than Connecticut does. See Neb. Const., art. I, § 1 (defense of self, family, home and others, lawful common defense, hunting and recreational use); N.H. Const., part I, art. 2-a (defense of self, family, property and state); N.M. Const., art. II, § 6 (similar to Nebraska); N.D. Const., art. I, § 1 (same); W. Va. Const., art. III, § 22 (same).

The third category contains provisions that track the language of the second amendment to the United States constitution. See N.C. Const., art. I, § 30.

The final category contains provisions explicitly stating that the right conferred is subject to regulation by the state. See Ga. Const., art. I, § 1 ("the General Assembly shall have power to prescribe the manner in which arms may be borne"); Idaho Const., art. 1, § 11, prior to 1978 amendment ("the legislature shall regulate the exercise of this right by law"); Ill. Const., art. I, § 22 (right "[s]ubject . . . to the police power"); La. Const., art. I, § 11 ("this provision shall not prevent the passage of laws to prohibit the carrying of weapons concealed on the person"); Tex. Const., art. I, § 23 ("the Legislature shall have power, by law, to regulate the wearing of arms, with a view to prevent crime").

v. *Birmingham,* 392 So. 2d 1226, 1228 (Ala. Crim. App. 1980), cert. denied sub nom. *Ex parte Hyde,* 392 So. 2d 1229 (Ala. 1981); *Robertson* v. *City & County of Denver,* 874 P.2d 325, 333 (Colo. 1994); *Carson* v. *State,* 241 Ga. 622, 628, 247 S.E.2d 68 (1978); *In re Brickey,* 8 Idaho 597, 599, 70 P. 609 (1902); *Matthews* v. *State,* 237 Ind. 677, 686, 148 N.E.2d 334 (1958); *People* v. *Brown,* 253 Mich. 537, 541, 235 N.W. 245 (1931); *State* v. *Fennell,* 95 N.C. App. 140, 143, 382 S.E.2d 231 (1989); *Arnold* v. *Cleveland,* 67 Ohio St. 3d 35, 46–47, 616 N.E.2d 163 (1993); *State* v. *Blocker,* 291 Or. 255, 259, 630 P.2d 824 (1981); *Webb* v. *State,* 439 S.W.2d 342, 343 (Tex. Crim. App.), cert. denied, 396 U.S. 968, 90 S. Ct. 450, 24 L. Ed. 2d 434 (1969); *State* v. *McAdams,* 714 P.2d 1236, 1237 (Wyo. 1986). States with recently enacted constitutional guarantees of the right to bear arms typically have followed this interpretation as well. See *State* v. *LaChapelle,* 234 Neb. 458, 460, 451 N.W.2d 689 (1990); *State* v. *Dees,* 100 N.M. 252, 255, 669 P.2d 261 (N.M. App. 1983); *State* v. *Ricehill,* 415 N.W.2d 481, 483 (N.D. 1987); *Princeton* v. *Buckner,* 180 W. Va. 457, 467, 377 S.E.2d 139 (1988); cf. *Kalodimos* v. *Morton Grove,* 103 Ill. 2d 483, 491–92, 470 N.E.2d 266 (1984) (right subject to textual limitations); *State* v. *Hamlin,* 497 So. 2d 1369, 1371 (La. 1986) (same); but see *State* v. *Smith,* 132 N.H. 756, 758, 571 A.2d 279 (1990) (felon in possession statute " 'narrowly serve[s] a significant government interest' ").

While we are not bound by the interpretations given by our sister state courts to their own constitutional documents, the uniformity in the analysis that they have used to address the question before us lends particular authority to their decisions. Moreover, the plaintiffs have not cited any historical tradition unique to this state suggesting that the right they invoke requires different treatment here.

The constitutional right to bear arms would be illusory, of course, if it could be abrogated entirely on the basis of a mere rational reason for restricting legislation. Accordingly, courts in other states also have recognized that the right would be infringed if, in the name of "reasonable regulation," a state were to proscribe the possession of all firearms that could be used in self-defense. "The police power cannot . . . be invoked in such a manner that it amounts to the destruction of the right to bear arms." *State* v. *McAdams*, supra, 714 P.2d 1237; see also *Lakewood* v. *Pillow*, 180 Colo. 20, 23, 501 P.2d 744 (1972) (statute prohibiting possession of firearm in vehicle or place of business for self-defense invalid); *In re Brickey*, supra, 8 Idaho 599 (statute prohibiting carrying of deadly weapon in any form in cities or towns invalid); *State* v. *Kessler*, 289 Or. 359, 372, 614 P.2d 94 (1980) (statute prohibiting possession of billy club in home invalid); *Princeton* v. *Buckner*, supra, 180 W. Va. 462–64 (voiding licensing statute as "overbroad").

To determine whether a particular arms control statute infringes on the constitutional right to bear arms, courts in other states have looked to several factors. First, courts have evaluated the characteristics of the particular weapon restricted. See *Robertson* v. *City & County of Denver*, supra, 874 P.2d 332 (citing finding that " 'assault weapons are capable both of a rapid rate of fire as well as of a capacity to fire an inordinately large number of rounds without reloading' "); *State* v. *Fennel*, supra, 95 N.C. App. 143–44 (noting dangerousness posed by sawed-off shotgun because of " 'wide and nearly indiscriminate scattering of its shot' "). Second, these courts have considered the related issue of the typical use for the proscribed weapons. See *Robertson* v. *City & County of Denver*, supra, 332 (noting links between assault weapons and "organized crime, gun trafficking, and terrorists"); *State* v. *Hamlin*, supra,

497 So. 2d 1371 (noting that principal peacetime use for sawed-off shotguns and rifles is crime); *People* v. *Brown*, supra, 253 Mich. 542 (describing blackjack as " 'characteristic weapon of urban gangsters and rowdies' "); *State* v. *LaChapelle*, supra, 234 Neb. 462 (noting criminal purposes of machine guns and sawed-off firearms). Third, these courts have compared the number and nature of the weapons subject to the ban with the number and nature of the weapons that remain available for the vindication of the right. See *Robertson* v. *City & County of Denver*, supra, 333 (statute banning assault weapons valid in part because "there are literally hundreds of alternative ways in which citizens may exercise the right to bear arms in self-defense"); *Matthews* v. *State*, supra, 237 Ind. 686 (same for statute regulating concealed weapons); see also *Hyde* v. *Birmingham*, supra, 392 So. 2d 1228 (statute cannot go so far as to render arms borne useless for self-defense).

Applying this type of analysis, courts in these states have upheld the constitutionality of statutes banning the possession of blackjacks; *People* v. *Brown*, supra, 253 Mich. 542; handguns; *Kalodimos* v. *Morton Grove*, supra, 103 Ill. 2d 511; concealed weapons; *Matthews* v. *State*, supra, 237 Ind. 686; *State* v. *McAdams*, supra, 714 P.2d 1238; sawed-off shotguns; *Carson* v. *State*, supra, 241 Ga. 628; *State* v. *Hamlin*, supra, 497 So. 2d 1371; *State* v. *LaChapelle*, supra, 234 Neb. 462; *State* v. *Fennell*, supra, 95 N.C. App. 144; and assault weapons. *Robertson* v. *City & County of Denver*, supra, 874 P.2d 333; *Arnold* v. *Cleveland*, supra, 67 Ohio St. 3d 49. Similar analyses have supported the constitutionality of statutes outlawing the possession of firearms by convicted felons; *People* v. *Blue*, 190 Colo. 95, 103, 544 P.2d 385 (1975); *State* v. *Amos*, 343 So. 2d 166, 168 (La. 1977); *State* v. *Ricehill*, supra, 415 N.W.2d 484; *McGuire* v. *State*, 537 S.W.2d 26, 28 (Tex. Crim. App.

1976); and the carrying of firearms into liquor establishments. *State* v. *Dees*, supra, 100 N.M. 255.

The Illinois Supreme Court, moreover, has persuasively argued that a state constitution should be read to permit regulation of the ownership of particular categories of weapons or particular means of possession, even though it would prohibit similar regulations targeted at categories of ideas or means of speech or expression. See *Kalodimos* v. *Morton Grove*, supra, 103 Ill. 2d 499. As that court explained, the right to bear arms is conceptually different from the guarantee of free speech, and free speech analysis is inapposite in this context. Whereas free speech cannot operate successfully when modes of expression are curtailed, and its value resides in the act of expression itself as well as in the effect of the message expressed; *Cohen* v. *California*, 403 U.S. 15, 24–26, 91 S. Ct. 1780, 29 L. Ed. 2d 284 (1971); L. Tribe, American Constitutional Law (2d Ed. 1988) § 12-1, p. 788; the purposes served by the constitutional right to bear arms are not integrally linked to the particular means by which they are achieved. Put simply, restricting the ability to possess particular types of dangerous weapons does not frustrate the core purpose of article first, § 15.

Applying these principles to the question presented here, we conclude that a statutory ban on assault weapons, because it continues to permit access to a wide array of weapons, does not infringe on the right to bear arms guaranteed by article first, § 15. The trial court found as a factual matter that assault weapons pose an increasing risk to society. The record reflects specific instances in which such weapons were used in criminal activity against police officers and innocent victims. Consequently, the ban serves a legitimate interest of the state acting pursuant to its police power. See *Plourde* v. *Liburdi*, 207 Conn. 412, 419, 540 A.2d 1054 (1988); *State* v. *Gordon*, 143 Conn. 698, 703, 125

A.2d 477 (1956). Moreover, the trial court specifically discredited testimony offered to establish that the weapons subject to the ban have legitimate self-defense qualities. Furthermore, the ban does not cover a significant percentage of firearms that continue to be available for citizens to possess.[10] As a result, the ban is sufficiently circumscribed so as not to intrude upon the constitutional interests protected by article first, § 15.

Our conclusion makes it unnecessary for us to consider the plaintiffs' argument concerning the level of judicial scrutiny to be applied upon a determination that interests protected by the right to bear arms have been infringed. Accordingly, that issue is reserved for another day.

## II

The plaintiffs next argue that the ban on assault weapons contravenes principles of equal protection. In their view, the enumeration of proscribed weapons in § 53-202a according to the names of firearms rather than by generic categories works an impermissible discrimination because, they maintain, the record indicates that the banned weapons cannot meaningfully be differentiated from weapons that are not banned. While we agree with the factual statement made by the plaintiffs, we disagree with the legal conclusion they derive therefrom.

We note at the outset that it is unclear how, if at all, this claim differs from the plaintiffs' claim raised directly under article first, § 15, since claims pertaining to "fundamental" rights typically are understood as equal protection challenges. See, e.g., *Shapiro* v. *Thompson*, 394 U.S. 618, 634, 89 S. Ct. 1322, 22 L. Ed.

---

[10] We have no occasion to determine whether a ban on all semiautomatic weapons would infringe on article first, § 15.

2d 600 (1969) (claim that durational residency requirement for welfare benefits infringes right to interstate travel resolved as equal protection violation); *Skinner* v. *Oklahoma*, 316 U.S. 535, 541, 62 S. Ct. 1110, 86 L. Ed. 1655 (1942) (same for claim involving right to procreation); *Horton I*, supra, 172 Conn. 640–49 (same for claim involving "fundamental" right to education under state constitution). Assuming, however, that the plaintiffs have stated a claim requiring separate analysis under the equal protection clause, they nonetheless cannot prevail.

The equal protection clauses of the federal and state constitutions apply only to "persons." U.S. Const., amend. XIV, § 1; Conn. Const., art. I, § 20; see also *Pembina Mining Co.* v. *Pennsylvania,* 125 U.S. 181, 189, 8 S. Ct. 737, 31 L. Ed. 650 (1888) (corporation is person for purposes of equal protection). The plaintiffs' challenge relates to classifications among weapons, not persons. *All* persons are forbidden to sell, transfer or possess any of the banned weapons, except in certain specified instances; General Statutes §§ 53-202b through 53-202d;[11] while *any* person may sell, trans-

---

[11] General Statutes § 53-202b provides: "SALE OR TRANSFER OF ASSAULT WEAPON PROHIBITED. CLASS C FELONY. (a) (1) Any person who, within this state, distributes, transports or imports into the state, keeps for sale, or offers or exposes for sale, or who gives any assault weapon, except as provided by sections 29-37j and 53-202a to 53-202k, inclusive, and subsection (h) of section 53a-46a, shall be guilty of a class C felony and shall be sentenced to a term of imprisonment of which two years may not be suspended or reduced.

"(2) Any person who transfers, sells or gives any assault weapon to a person under eighteen years of age in violation of subdivision (1) of this subsection shall be sentenced to a term of imprisonment of six years, which shall not be suspended or reduced and shall be in addition and consecutive to the term of imprisonment imposed under subdivision (1) of this subsection.

"(b) The provisions of subsection (a) of this section shall not apply to:

"(1) The sale of assault weapons to the department of public safety, police departments, the department of correction or the military or naval forces of this state or of the United States for use in the discharge of their official duties;

fer or possess any weapon not subject to the ban, within the limits otherwise established by law. Accordingly,

"(2) A person who is the executor or administrator of an estate that includes an assault weapon for which a certificate of possession has been issued under section 53-202d which is disposed of as authorized by the probate court, if the disposition is otherwise permitted by sections 29-37j and 53-202a to 53-202k, inclusive, and subsection (h) of section 53a-46a;

"(3) The transfer by bequest or intestate succession of an assault weapon for which a certificate of possession has been issued under section 53-202d."

General Statutes § 53-202c provides: "POSSESSION OF ASSAULT WEAPON PROHIBITED. CLASS D FELONY. (a) Except as provided in section 53-202e, any person who, within this state, possesses any assault weapon, except as provided in sections 29-37j and 53-202a to 53-202k, inclusive, and subsection (h) of section 53a-46a, shall be guilty of a class D felony and shall be sentenced to a term of imprisonment of which one year may not be suspended or reduced; except that a first-time violation of this subsection shall be a class A misdemeanor if (1) the person presents proof that he lawfully possessed the assault weapon prior to October 1, 1993, and (2) the person has otherwise possessed the firearm in compliance with subsection (d) of section 53-202d.

"(b) The provisions of subsection (a) of this section shall not apply to the possession of assault weapons by members or employees of the department of public safety, police departments, the department of correction or the military or naval forces of this state or of the United States for use in the discharge of their official duties; nor shall anything in sections 29-37j and 53-202a to 53-202k, inclusive, and subsection (h) of section 53a-46a prohibit the possession or use of assault weapons by sworn members of these agencies when on duty and the use is within the scope of their duties.

"(c) The provisions of subsection (a) of this section shall not apply to the possession of an assault weapon by any person prior to July 1, 1994, if all of the following are applicable:

"(1) The person is eligible under sections 29-37j and 53-202a to 53-202k, inclusive, and subsection (h) of section 53a-46a to apply for a certificate of possession for the assault weapon by July 1, 1994;

"(2) The person lawfully possessed the assault weapon prior to October 1, 1993; and

"(3) The person is otherwise in compliance with sections 29-37j and 53-202a to 53-202k, inclusive, and subsection (h) of section 53a-46a.

"(d) The provisions of subsection (a) of this section shall not apply to a person who is the executor or administrator of an estate that includes an assault weapon for which a certificate of possession has been issued under section 53-202d, if the assault weapon is possessed at a place set forth in subdivision (1) of subsection (d) of section 53-202d or as authorized by the probate court."

General Statutes § 53-202d provides: "CERTIFICATE OF POSSESSION OF ASSAULT WEAPON. CERTIFICATE OF TRANSFER OF ASSAULT WEAPON TO GUN

the plaintiffs have not raised a claim that falls within the scope of the constitutional guarantee they seek to

DEALER. CIRCUMSTANCES WHERE POSSESSION OF ASSAULT WEAPON AUTHO-RIZED. (a) Any person who lawfully possesses an assault weapon, as defined in section 53-202a, prior to October 1, 1993, shall apply by October 1, 1994, or, if such person is a member of the military or naval forces of this state or of the United States and is unable to apply by October 1, 1994, because he or she is or was on official duty outside of this state, shall apply within ninety days of returning to the state to the department of public safety, for a certificate of possession with respect to such assault weapon. The certificate shall contain a description of the firearm that identifies it uniquely, including all identification marks, the full name, address, date of birth and thumbprint of the owner, and any other information as the department may deem appropriate. The department shall adopt regulations in accordance with the provisions of chapter 54 not later than January 1, 1994, to establish procedures with respect to the application for and issuance of certificates of possession pursuant to this section. Notwithstanding the provisions of sections 1-19 and 1-19a, the name and address of a person issued a certificate of possession shall be confidential and shall not be disclosed, except such records may be disclosed to law enforcement agencies.

"(b) No assault weapon possessed pursuant to this section may be sold or transferred on or after January 1, 1994, to any person within this state other than to a licensed gun dealer, as defined in subsection (d) of section 53-202f, or as provided in section 53-202e, or by bequest or intestate succession. Any person who obtains title to an assault weapon for which a certificate of possession has been issued under this section by bequest or intestate succession shall, within ninety days of obtaining title, apply to the department of public safety for a certificate of possession as provided in subsection (a) of this section, render the weapon permanently inoperable, sell the weapon to a licensed gun dealer or remove the weapon from the state. Any person who moves into the state in lawful possession of an assault weapon, shall, within ninety days, either render the weapon permanently inoperable, sell the weapon to a licensed gun dealer or remove the weapon from this state, except any person who is a member of the military or naval forces of this state or of the United States, is in lawful possession of an assault weapon and has been transferred into the state after October 1, 1994, may, within ninety days of arriving in the state, apply to the department of public safety for a certificate of possession with respect to such assault weapon.

"(c) If an owner of an assault weapon sells or transfers the weapon to a licensed gun dealer, he shall, at the time of delivery of the weapon, execute a certificate of transfer and cause the certificate to be mailed or delivered to the commissioner of public safety. The certificate shall contain: (1) The date of sale or transfer; (2) the name and address of the seller or transferor and the licensed gun dealer, their social security numbers or

invoke. Compare *Caldor's, Inc.* v. *Bedding Barn, Inc.*, 177 Conn. 304, 323–25, 417 A.2d 343 (1979) (invalidating, on due process and equal protection grounds, Sunday closing law drawing distinctions between stores that may sell items), with *State* v. *Hurliman,* 143 Conn. 502, 505–508, 123 A.2d 767 (1956) (upholding Sunday closing law drawing distinctions between type of items that may be sold).

Even if the plaintiffs' argument were construed as an allegation that *people* who possess a listed firearm are treated differently from *people* who possess an unlisted firearm, and that this disparate treatment violates principles of equal protection, the plaintiffs would

---

motor vehicle operator license numbers, if applicable; (3) the licensed gun dealer's federal firearms license number and seller's permit number; (4) a description of the weapon, including the caliber of the weapon and its make, model and serial number; and (5) any other information the commissioner prescribes. The licensed gun dealer shall present his motor vehicle operator's license or social security card, federal firearms license and seller's permit to the seller or transferor for inspection at the time of purchase or transfer. The commissioner of public safety shall maintain a file of all certificates of transfer at his central office.

"(d) A person who has been issued a certificate of possession of an assault weapon under this section may possess it only under the following conditions:

"(1) At that person's residence, place of business or other property owned by that person, or on property owned by another with the owner's express permission;

"(2) While on the premises of a target range of a public or private club or organization organized for the purpose of practicing shooting at targets;

"(3) While on a target range which holds a regulatory or business license for the purpose of practicing shooting at that target range;

"(4) While on the premises of a licensed shooting club;

"(5) While attending any exhibition, display or educational project which is about firearms and which is sponsored by, conducted under the auspices of, or approved by a law enforcement agency or a nationally or state recognized entity that fosters proficiency in, or promotes education about, firearms; or

"(6) While transporting the assault weapon between any of the places mentioned in this subsection, or to any licensed gun dealer, as defined in subsection (d) of section 53-202f, for servicing or repair pursuant to subsection (c) of section 53-202f, provided the assault weapon is transported as required by section 53-202f."

not prevail on the merits of this claim. "When a statute is challenged on equal protection grounds, whether under the United States constitution or the Connecticut constitution, the reviewing court must first determine the standard by which the challenged statute's constitutional validity will be determined. If, in distinguishing between classes, the statute either intrudes on the exercise of a fundamental right or burdens a suspect class of persons, the court will apply a strict scrutiny standard wherein the state must demonstrate that the challenged statute is necessary to the achievement of a compelling state interest. . . . If the statute does not touch upon either a fundamental right or a suspect class, its classification need only be rationally related to some legitimate government purpose in order to withstand an equal protection challenge. . . ." (Citations omitted; internal quotation marks omitted.) *Circuit-Wise, Inc.* v. *Commissioner of Revenue Services*, 215 Conn. 292, 299–302, 576 A.2d 1259 (1990); *Harbor Ins. Co.* v. *Groppo*, 208 Conn. 505, 508–509, 544 A.2d 1221 (1988); see also *Daly* v. *DelPonte*, supra, 225 Conn. 513–14 (applying strict scrutiny to classification on basis of physical disability under article first, § 20, as amended, of state constitution). "Moreover, there is the established principle that those who challenge the constitutionality of a state statute bear the heavy burden of demonstrating beyond a reasonable doubt that the presumption of its validity has been overcome." *Harbor Ins. Co.* v. *Groppo*, supra, 510.

The plaintiffs have not argued that the statutes at issue burden a suspect class. Cf. *Daly* v. *DelPonte*, supra, 225 Conn. 512–15. Furthermore, even if the right to bear arms guaranteed by article first, § 15, were to be deemed "fundamental," we already have concluded that the ban on assault weapons does not "intrude" on the exercise of that right. See *Circuit-Wise, Inc.* v. *Commissioner of Revenue Services*, supra,

215 Conn. 299. Accordingly, the plaintiffs' claim would not warrant strict scrutiny review.

We therefore apply rational basis review, which the statutory ban on assault weapons satisfies. "Under the rational basis test, the court's function . . . is to decide whether the purpose of the legislation is a legitimate one and whether the particular enactment is designed to accomplish that purpose in a fair and reasonable way." (Internal quotation marks omitted.) *Harbor Ins. Co.* v. *Groppo*, supra, 208 Conn. 509–10. We already have concluded that the state has a legitimate interest in regulating assault weapons. The legislature's decision to prohibit the possession of some weapons and not others does not render the ban on assault weapons irrational. To begin with, the trial court's finding that some weapons not proscribed by the statutory ban are "virtually identical" to weapons that are proscribed suggests that while the unbanned weapons may share many of the functional characteristics of the banned weapons, the two categories nonetheless are in fact distinguishable. We need not rest our decision on so slender a reed, however, because "mere underinclusiveness is not fatal to the validity of a law under . . . equal protection . . . even if the law disadvantages an individual or identifiable members of a group . . . ." (Citations omitted.) *Nixon* v. *Administrator of General Services*, supra, 433 U.S. 471 n.33.

"[W]e are guided by the familiar principles that a 'statute is not invalid under the Constitution because it might have gone farther than it did,' *Roschen* v. *Ward*, 279 U.S. 337, 339 [49 S. Ct. 336, 73 L. Ed. 722 (1928)], that a legislature need not 'strike at all evils at the same time,' *Semler* v. *Dental Examiners*, 294 U.S. 608, 610 [55 S. Ct. 570, 79 L. Ed. 1086 (1935)], and that 'reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind,' *Williamson* v. *Lee Opti-*

*cal Co.,* 348 U.S. 483, 489 [75 S. Ct. 461, 99 L. Ed. 563 (1955)]." *Katzenbach* v. *Morgan,* 384 U.S. 641, 657, 86 S. Ct. 1717, 16 L. Ed. 2d 828 (1966). "Legislatures may implement their program step by step . . . adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations." (Citation omitted.) *New Orleans* v. *Dukes,* 427 U.S. 297, 303, 96 S. Ct. 2513, 49 L. Ed. 2d 511 (1976); *Mario* v. *Fairfield,* 217 Conn. 164, 177, 585 A.2d 87 (1991).

The legislature was free to conclude that the weapons proscribed by the statutory ban, even if actually identical to unproscribed weapons, justified separate treatment purely because, for example, of their greater presence in the state. The plaintiffs, who carry the burden of demonstrating invidious discrimination and of rebutting the presumption of constitutionality, have offered no evidence whatsoever suggesting that the legislature knew that any of the unproscribed weapons posed as great a threat to the welfare of the residents of this state as do the proscribed weapons. See, e.g., *Katzenbach* v. *Morgan,* supra, 384 U.S. 657–58 (Congress' greater familiarity with particular schools justifies treating them differently from other, arguably similar schools with which Congress was less familiar); *Williamson* v. *Lee Optical Co.,* supra, 348 U.S. 489 (complainant failed to demonstrate lack of a justifiable basis for differential treatment of ophthalmologists and opticians).

Moreover, the plaintiffs cannot succeed even if their argument could be construed to suggest that the statutory ban fails in any meaningful way to advance the legislature's goal of public safety, because people will simply obtain unproscribed weapons of comparable firepower. The legislature rationally could have believed that banning the possession of the proscribed weapons would advance public safety, and that belief would not

retroactively be rendered irrational if the predicted result did not emerge in practice. See *Caldor's, Inc. v. Bedding Barn, Inc.*, supra, 177 Conn. 314 (expressing skepticism that "even demonstrated lack of efficacy would suffice to establish a violation" of constitutional standard applicable here).

The legislature accordingly is not restricted in its options either to banning all weapons it considers harmful to the welfare of the citizenry or to banning none at all.[12] See *Geduldig v. Aiello*, 417 U.S. 484, 495, 94 S. Ct. 2485, 41 L. Ed. 2d 256 (1974); *Railway Express Agency, Inc. v. New York*, 336 U.S. 106, 110, 69 S. Ct. 463, 93 L. Ed. 533 (1949); *Faraci v. Connecticut Light & Power Co.*, 211 Conn. 166, 172–73, 558 A.2d 234 (1989).

### III

The plaintiffs next argue that, as to the plaintiff Navegar, Inc. (Navegar), the manufacturer of the Intratec TEC-9 and Skorpion assault weapons, the ban on assault weapons is a bill of attainder in violation of article first, § 13.[13] We disagree.

The United States Supreme Court has defined bills of attainder as "legislative acts . . . that apply either to named individuals or to easily ascertainable mem-

---

[12] The legislative history of No. 93-306 of the 1993 Public Acts provides an apt illustration of the incremental nature of much legislative activity in the real world, which our rule of judicial review recognizes. See, e.g., 36 S. Proc., Pt. 14, 1993 Sess., p. 4864, remarks of Senator George C. Jepsen ("If we restrict the list, we're damned because of the guns we left out. If we expand the list, we're damned for the guns we keep in."), pp. 4884–85, remarks of Senator Thirman L. Milner ("Like the Workers' Compensation bill, the desegregation bill, the unemployment compensation bill, the no-fault bill . . . this ban is not the solution. Well, like we said on each one of those bills, it is a beginning."), and p. 4900, remarks of Senator Judith G. Freedman ("This is not the perfect bill. It's not the solution, but it's a step in the right direction.").

[13] The constitution of Connecticut, article first, § 13, provides: "No person shall be attainted of treason or felony, by the legislature."

bers of a group in such a way as to inflict punishment on them without a judicial trial . . . ." *United States* v. *Lovett*, 328 U.S. 303, 315, 66 S. Ct. 1073, 90 L. Ed. 1252 (1946); accord *Selective Service System* v. *Minnesota Public Interest Research Group*, 468 U.S. 841, 846–47, 104 S. Ct. 3348, 82 L. Ed. 2d 632 (1984), quoting *Nixon* v. *Administrator of General Services*, supra, 433 U.S. 468; see also *State* v. *Washburn*, 34 Conn. App. 557, 562, 642 A.2d 70, cert. denied, 230 Conn. 912, 645 A.2d 1017 (1994). The plaintiffs have offered no reason to diverge from this definition in interpreting article first, § 13.[14] We therefore conclude in this case, for two reasons, that the ban on assault weapons is not a bill of attainder.

First, the ban does not "inflict punishment . . . without a judicial trial." *United States* v. *Lovett*, supra, 328 U.S. 315. The ban imposes no "punishment" because it does not apply to past conduct. Rather, it applies only to conduct that occurs after the effective date of the ban. See *Selective Service System* v. *Minnesota Public Interest Research Group*, supra, 468 U.S. 849–51 (law denying federal student aid to nonregistrants for draft not bill of attainder because nonregistrants who register for draft by act's effective date immediately become eligible for aid). Moreover, a penalty applicable to those who possess proscribed weap-

---

[14] The United States Supreme Court provided this definition in interpreting article one, § 9, of the United States constitution, which provides in relevant part: "No bill of Attainder or ex post facto Law shall be passed." Because the plaintiffs have furnished no reason why we should interpret our state constitutional provision differently than its federal counterpart, we construe the provisions identically for the purposes of this case. Cf. *State* v. *Barnes*, 232 Conn. 740, 744 n.4, 657 A.2d 611 (1995) (refusing to entertain state constitutional claim where party failed to provide independent analysis of state constitutional provision at issue); *State* v. *Ellis*, 232 Conn. 691, 692 n.1, 657 A.2d 1099 (1995) (same); *State* v. *Robinson*, 227 Conn. 711, 721, 631 A.2d 288 (1993) (same); *State* v. *Geisler*, supra, 222 Conn. 684–85 (setting out factors to be considered in reviewing contours of state constitutional provisions).

ons in the future can be imposed only on those who are duly convicted *after* a judicial trial.

Second, even if the statutory ban could be considered to be a legislative punishment of Navegar without judicial trial, in that it prohibits Navegar from selling its Intratec TEC-9 and Skorpion weapons in Connecticut, that punishment could not be said to apply only to "named individuals or to easily ascertainable members of a group." *United States* v. *Lovett*, supra, 328 U.S. 315; *Nixon* v. *Administrator of General Services*, supra, 433 U.S. 474 (characterizing as bills of attainder laws "barring *designated individuals or groups* from participation in specified employments or vocations, a mode of punishment commonly employed against those legislatively branded as disloyal" [emphasis added]). The statutory ban prohibits *everyone* from selling the Intratec TEC-9 and the Skorpion. It also prohibits *everyone* from possessing those weapons, except for law enforcement officials, gun dealers and those who purchased their weapons before the effective date of the act. The fact that the ban on assault weapons specifies proscribed firearms by name of manufacturer does not somehow transform it into a bill of attainder. Cf. *Nixon* v. *Administrator of General Services*, supra, 471–72 (statute's naming of particular president in directing collection of presidential papers does not make statute bill of attainder).

## IV

Having rejected the plaintiffs' assertions relating to the substance of the ban on assault weapons, we turn to the parties' arguments relating to the language of the prohibition. The plaintiffs contend that the trial court improperly determined that the ban is not vague as a whole and, alternatively, that the portion of the statute that it found to be vague could be severed in order to prevent total invalidation of the act. The

defendants argue that, under the facial vagueness rules applicable to the plaintiffs' challenge, the trial court improperly failed to reject all the plaintiffs' vagueness claims. We agree with the defendants.

" 'Under the requirements of due process of law mandated by our federal and state constitutions, a penal statute must be sufficiently definite to enable a person to know what conduct he must avoid. *State* v. *Proto*, 203 Conn. 682, 696, 526 A.2d 1297 (1987); *State* v. *Pickering*, 180 Conn. 54, 59–60, 428 A.2d 322 (1980); see *Buckley* v. *Valeo*, 424 U.S. 1, 77, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976); *State* v. *Eason*, 192 Conn. 37, 46, 470 A.2d 688 (1984) [overruled in part on other grounds, *Paulsen* v. *Manson*, 203 Conn. 484, 525 A.2d 1315 (1987)]. [A] statute which either forbids or requires the doing of an act in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law. *Connally* v. *General Construction Co.*, 269 U.S. 385, 391, 46 S. Ct. 126, 70 L. Ed. 322 (1926); *State* v. *Eason*, supra [46]; *State* v. *Pickering*, supra, 60.' " *State* v. *Linares*, 232 Conn. 345, 354, 655 A.2d 737 (1995); *State* v. *Williams*, 205 Conn. 456, 469–70, 534 A.2d 230 (1987).

"[P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Hoffman Estates* v. *Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499, 102 S. Ct. 1186, 71 L. Ed. 2d 362 (1982); *State* v. *Linares*, supra, 232 Conn. 354.

By requesting a declaratory judgment that the ban on assault weapons is vague, rather than raising vagueness as a defense in a criminal enforcement action, the

plaintiffs necessarily assert that the statute is facially vague, or vague in all its applications. "A statute that is impermissibly vague in all its applications is vague, 'not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all. . . . Such a provision simply has *no* core.' (Citations omitted; emphasis in original.) *Smith* v. *Goguen*, 415 U.S. 566, 578, 94 S. Ct. 1242, 39 L. Ed. 2d 605 (1974); see also *Parker* v. *Levy*, 417 U.S. 733, 94 S. Ct. 2547, 41 L. Ed. 2d 439 (1974); *State* v. *Ball*, 226 Conn. 265, 271, 627 A.2d 892 (1993); *State* v. *Pickering*, [supra, 180 Conn. 65]. Professor Laurence Tribe calls such a statute 'perfectly vague.' L. Tribe, [supra,] § 12-32, p. 1036." *State* v. *Indrisano*, 228 Conn. 795, 804, 640 A.2d 986 (1994).

To prevail on their vagueness claim, the plaintiffs therefore must demonstrate that the statute has no core meaning. Put another way, a determination that the statute is not vague with respect to at least one application will defeat their facial challenge. This burden is augmented by our strong presumption, noted above, in favor of the statute's constitutionality. Id., 805; *State* v. *Floyd*, 217 Conn. 73, 79, 584 A.2d 1157 (1991); *State* v. *Breton*, 212 Conn. 258, 269, 562 A.2d 1060 (1989).

We are persuaded that each portion of the ban on assault weapons challenged by the plaintiffs on vagueness grounds has a core meaning sufficient to sustain it against facial attack. The trial court determined that all of the weapons enumerated in § 53-202a, with the exception of three categories, were described with sufficient clarity to inform a person of ordinary intelligence what the statute proscribes. Although challenged by the plaintiffs, the trial court's findings are amply sup-

ported by the testimony of the several expert witnesses presented by the parties.[15]

We therefore proceed to consider only the portions of the statute that the trial court found to be unconstitutionally vague. The trial court concluded that the use of the term "type" in § 53-202a was impermissibly vague. That word appears in three locations: following "AK-47"; "MAC-10, MAC-11 and MAC-11 Carbine"; and "Auto-Ordnance Thompson." The trial court determined that "type" was severable from the references to the AK-47 and the several MAC firearms, and the court therefore deleted only the word "type" in those contexts to cure the perceived constitutional infirmity. Believing that "type" could not be severed from Auto-Ordnance Thompson, however, the court deleted that entire phrase from the statute.

We conclude that the constitution did not compel that these excisions be made. The question before the trial court was whether the phrases "AK-47 type," "MAC-10, MAC-11 and MAC-11 Carbine type" and "Auto-Ordnance Thompson type" completely lack a core of meaning. With respect to the first two phrases, the trial court found by necessary implication that the references in the statute to AK-47 and MAC firearms were themselves sufficiently clear to satisfy due process. That clarity, in turn, infuses the phrases "AK-47 type" and "MAC-10, MAC-11 and MAC-11 Carbine type" with sufficient meaning to satisfy the constitutional requirements of facial vagueness analysis.[16] In

---

[15] In its memorandum of decision, the trial court noted the testimony of Colonel Leonard Supenski, chief of the technical bureau of the Baltimore county police department, who testified about the sources from which, in his opinion, an ordinarily intelligent citizen could receive information sufficient to notify that citizen which weapons are banned.

[16] That finding was supported by the evidence in the record. Supenski, testifying about a publication from the Federal Bureau of Alcohol, Tobacco and Firearms that similarly uses the word "type" in relation to firearms, stated: "The reason for that, the type basically means the basic receiver

other words, because the AK-47 and the MAC weapons are identifiable, the statutory phrases "AK-47 type" and "MAC-10, MAC-11 and MAC-11 Carbine type" give adequate notice that, at the very least, the statute proscribes AK-47s and the enumerated MACs.

With respect to the third phrase, one of the plaintiffs' own experts, engineer Charles Fagg, was able to identify Auto-Ordnance Thompson weapons. He also identified many weapons that, in his opinion, were "like" such weapons. Indeed, the plaintiffs' claim relies on the proposition that the phrase is facially vague *not* because no firearm comes within its core, but because too many firearms do. Nonetheless, on cross-examination Fagg himself felt sufficiently certain of the characteristics of an "Auto-Ordnance Thompson type" firearm that he testified concerning the firing capabilities of such a weapon. Moreover, even if we could read the phrase "Auto-Ordnance Thompson type" so broadly as to destroy its core meaning, we decline to do so. "[W]e read the statute narrowly in order to save its constitutionality, rather than broadly in order to destroy it." *State* v. *Indrisano*, supra, 228 Conn. 805. The state correctly points out that, consistent with the principle of ejusdem generis, the phrase "Auto-Ordnance Thompson type" should be interpreted to include only those Auto-Ordnance Thompson firearms that share characteristics similar to the other

---

of the firearm or the basic design of the firearm, what you can do to a firearm. And we will take the Thompson as an example.

"You can add, subtract features, then you can call that a model A-1, a model M-1, you can call it a model hypothetically X, Y, Z. You take off a front grip, put a pistol grip on it. That is where those variations, variance, derivation of the same weapon. That is basically why they refer to it as a type in all of its various configuration."

In addition, one of the plaintiffs' expert witnesses, engineer Charles Fagg, who professed complete confusion about the meaning of a "type" of weapon, testified concerning those weapons he considered to be "most closely related" to an AK-47, as well as those that were less closely related.

weapons listed in § 53-202a. See *Scrapchansky* v. *Plainfield*, 226 Conn. 446, 455, 627 A.2d 1329 (1993); *State* v. *Russell*, 218 Conn. 273, 278, 588 A.2d 1376 (1991). Our adoption of this interpretive gloss provides a sufficient core of meaning to remedy any facial vagueness that might otherwise exist. Cf. *State* v. *Indrisano*, supra, 805–806.

We emphasize that our decision today in no way prejudges claims that the ban on assault weapons is vague as applied in any particular enforcement action. Accordingly, we express no opinion as to whether a particular person, charged with violation of the ban on assault weapons because of the sale, transfer or possession of a listed firearm, might allege that he or she had inadequate notice that the particular firearm was proscribed. See *State* v. *Linares*, supra, 232 Conn. 363.

To summarize, we hold that the ban on assault weapons, General Statutes §§ 53-202a through 53-202k, does not infringe on the right to bear arms in self-defense guaranteed by article first, § 15, of the Connecticut constitution. The ban does not violate principles of equal protection, and it is not a bill of attainder. Finally, all of the provisions contained in § 53-202a, enumerating the proscribed firearms, are sufficiently clear to satisfy the due process requirements of facial vagueness analysis applicable in this declaratory judgment action.

The judgment is reversed in part, and the case is remanded with direction to render judgment in favor of the defendants.

In this opinion the other justices concurred.