******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

MERSCORP HOLDINGS, INC., ET AL. *v.*
DANNEL P. MALLOY ET AL.
(SC 19376)

Palmer, Zarella, Eveleigh, Espinosa and Robinson, Js.

*Argued October 14, 2015—officially released February 23, 2016*

*Linda L. Morkan*, with whom were *Benjamin C. Jensen* and, on the brief, *James A. Wade* and *Norman H. Roos*, for the appellants (plaintiffs).

*Matthew J. Budzik*, assistant attorney general, with whom were *Heather J. Wilson*, assistant attorney general, and, on the brief, *George Jepsen*, attorney general, for the appellees (defendants).

*Ryan P. Barry* and *Michael J. Dyer* filed a brief for the Connecticut Bankers Association et al. as amici curiae.

*J. L. Pottenger, Jr., Jeffrey Gentes*, and *Aurelia Chaudhury, Nicholas Gerschman* and *Marian Messing*, law student interns, filed a brief for the Jerome N. Frank Legal Services Organization and the Connecticut Fair Housing Center as amici curiae.

*Opinion*

PALMER, J. In 2013, the legislature amended the statutes governing Connecticut's public land records system to create a two tiered system in which a mortgage nominee operating a national electronic database to track residential mortgage loans must pay recording fees approximately three times higher than do other mortgagees. The plaintiffs, MERSCORP Holdings, Inc., and Mortgage Electronic Registration Systems, Inc., who are currently the only entities required to pay the increased recording fees, commenced the present action against the defendants, Governor Dannel P. Malloy, Attorney General George Jepsen, Treasurer Denise L. Nappier, Kendall F. Wiggin, the state librarian, and LeAnne R. Power, the state public records administrator,[1] seeking, inter alia, injunctive relief and a judgment declaring that this two tiered fee structure violates various provisions of the federal and state constitutions. Specifically, the plaintiffs alleged that General Statutes §§ 7-34a (a) (2) and 49-10 (h), as amended, violate the equal protection, due process, and takings provisions of the federal and state constitutions, the federal dormant commerce clause, and the federal prohibition against bills of attainder. The plaintiffs further alleged that enforcement of the statutes violates 42 U.S.C. § 1983. The parties filed motions for summary judgment, and the trial court granted the state's motion for summary judgment on all counts and rendered judgment thereon. This appeal followed.[2] We affirm the judgment of the trial court.

I

This case concerns the filing fees that the parties to a residential mortgage loan must pay to record mortgage documents in the public land records in Connecticut. Because the plaintiffs raise both federal and state constitutional issues of first impression, it will be helpful before considering the plaintiffs' claims to briefly review the traditional procedure for recording residential mortgage documents, certain relatively recent changes to that system, and the novel response of the Connecticut legislature to those changes.

Under the traditional residential mortgage model, a person seeking to finance the purchase of a residential property obtains a loan from a lender, typically a bank, in exchange for a promissory note committing the borrower to repay the loan. To secure the loan, the borrower provides the lender a mortgage on the property. Although, in Connecticut, there is no legal requirement that the lender record the mortgage in the public land records, mortgages typically are recorded—via the clerk of the town in which the property is situated—in order (1) to perfect the lender's security interest by giving public notice thereof, and (2) to maintain a complete public chain of title.

Under the traditional model, the bank or other lender maintains the loan on its books and continues to service the loan until it is repaid. At that point, the parties typically record a release of the mortgage in the land records. At a minimum, then, the life of a residential mortgage loan may involve only two recordable events, although other events—for example, a transfer of the mortgage loan to another lender, or the creation or subordination of a home equity credit line—also may arise under the traditional model.

The most significant factor in the decline of the traditional residential mortgage model has been the development and evolution of the secondary mortgage market. A secondary market is created when the initial lender sells the mortgage loan to outside investors. Doing so provides local lenders with greater liquidity, which facilitates additional home buying, and also allows large outside investors to pool—and thus to minimize—the risk that any particular loan will go into default. Although the modern secondary mortgage market had its genesis in the creation of the Federal Housing Authority and associated government sponsored financing corporations such as Fannie Mae in the 1930s, it expanded dramatically in the 1980s with the advent of new types of mortgage backed securities for sale in the private equity markets.

For mortgage loans sold in the secondary market, the investor typically engages a third party to perform servicing functions such as payment collection and file maintenance. Both the loan itself and the servicing rights may be sold or transferred multiple times over the life of a loan. Under the common-law rule, as codified in many states, the mortgage follows the note, so that an investor who acquires a residential note automatically obtains the attached security interest as well.

Although the development of a robust and sophisticated secondary market has had a dramatic impact on the liquidity and, with some notable exceptions, the stability of the residential mortgage loan market, it also has created challenges for the public land record system. Because the ownership and servicing rights to a loan may be transferred multiple times over the life of a loan, the mortgagee of record, which may be either the note holder or the servicer as nominee, will frequently change. This means that each subsequent holder must choose either (1) to undertake the costly and time-consuming process of recording each of the numerous mortgages that it may briefly hold, subject to the varying costs and requirements of each state's county or, as in Connecticut, each town clerk, or (2) to decline to record its interest, which may result in potential problems and costs resulting from an incomplete public chain of title.

To address these problems, in the 1990s, the major public financial service corporations, in collaboration

with various private interests, developed the national Mortgage Electronic Registration Systems (MERS) system. There are two primary components to the MERS model.[3] First, MERS operates a national electronic registration system that tracks any changes in the ownership and servicing rights of MERS-registered loans between MERS members, who include in-state and out-of-state mortgage lenders, servicers and subservicers, and public finance institutions. In this sense, MERS operates as a centralized, virtual alternative to the hundreds of traditional county or town land recording systems throughout the country. Second, because MERS members cannot completely eschew the use of the public land records, MERS becomes the mortgage nominee on any loans held by MERS members, and is identified as such when the mortgage is initially recorded in the land records. Recording a mortgage with MERS as a mortgage nominee essentially creates a placeholder for the electronic MERS system in the public records, allowing the two systems to interoperate. That is to say, if a party searching the chain of title on a property comes upon a recorded mortgage to MERS, the party is thereby notified that the MERS database may be consulted to determine the present beneficial owner of the mortgage and loan, as well as any related servicing rights or subordinate security interests. MERS remains the mortgagee of record in the public records until the mortgage either is released or assigned to a nonmember of MERS.

One potential advantage of the MERS system is that it eliminates the costs, in both time and fees, associated with recording each subsequent mortgage assignment in the public land records. Although the plaintiffs in the present case do not concede that any such savings have been realized in Connecticut, the parties do agree that, as of 2013, approximately 65 percent of mortgage loans nationally and in Connecticut originated with MERS acting as the mortgagee. The plaintiffs' principal place of business is in Virginia.

Turning our attention to the legislation that led to the present action, we note that, prior to July 15, 2013, § 7-34a required that all filers pay the town clerk $10 for the first page of each document filed in the land records, plus $5 for each subsequent page. General Statutes (Rev. to 2013) § 7-34a (a). Section 7-34a imposed additional fees of $3 and $40 per filing; General Statutes (Rev. to 2013) § 7-34a (d) and (e); and an additional fee of $2 per assignment after the first two assignments. General Statutes (Rev. to 2013) § 7-34a (a).

In 2013, General Statutes (Rev. to 2013) § 7-34a was amended by Public Acts, No. 13-184, § 98 (P.A. 13-184), and Public Acts, No. 13-247, § 82 (P.A. 13-247). As amended, § 7-34a defines a "nominee of a mortgagee" as "any person who (i) serves as mortgagee in the land records for a mortgage loan registered on a national

electronic database that tracks changes in mortgage servicing and beneficial ownership interests in residential mortgage loans on behalf of its members, and (ii) is a nominee or agent for the owner of the promissory note or the subsequent buyer, transferee or beneficial owner of such note." General Statutes § 7-34a (a) (2) (C). The parties agree that MERS is presently the only entity that qualifies as a nominee of a mortgagee, as so defined, and that the legislature crafted the statutory language with MERS specifically in mind.

Section 7-34a, as amended, further provides that, with two exceptions, when a nominee of a mortgagee files a document in the land records, the town clerk shall collect a fee of $116 for the first page filed and $5 for each additional page. General Statutes § 7-34a (a) (2) (A). In addition, the clerk continues to collect $3 for each document pursuant to § 7-34a (d) and $40 for each document pursuant to § 7-34a (e). The two exceptions are that, when a nominee of a mortgagee files "(i) an assignment of mortgage in which a nominee of a mortgagee appears as assignor, or (ii) a release of mortgage by the nominee of a mortgagee," the town clerk collects a fee of $159, plus $10 for the first page and $5 for each additional page.[4] See General Statutes § 7-34a (a) (1) and (2) (B). The recording fees for all other filers remain unchanged under the amended statute.

The net effect of the amendments to § 7-34a (a) is to collect from a nominee of a mortgagee, namely, MERS, substantially more for the filing of deeds, assignments, and other documents in the land records than from any other filer. When filing a mortgage deed, for example, if MERS is a party to the transaction, the recording fee will be $159 ($116 plus $3 plus $40) for the first page and $5 for each additional page. See General Statutes § 7-34a (a) (2) (A), (d) and (e). If MERS is not a party to the transaction, the recording fee will be $53 ($10 plus $3 plus $40) for the first page and $5 for each additional page. See General Statutes § 7-34a (a) (1), (d) and (e). When filing a mortgage assignment or release, if MERS is a party to the transaction, the recording fee will be $159, plus $10 for the first page and $5 for each additional page.[5] See General Statutes § 7-34a (a) (1) and (2) (B). If MERS is not a party to the transaction, the recording fee will be $53 ($10 plus $3 plus $40) for the first page and $5 for each additional page. See General Statutes § 7-34a (a) (1), (d) and (e).

The 2013 amendments also shifted how the recording fees on MERS-related transactions are allocated. See generally P.A. 13-184, § 97, and P.A. 13-247, § 81, codified at General Statutes § 49-10 (h). The $159 assessed for the filing of mortgage deeds in connection with MERS transactions is allocated as follows: $10, plus any fees for additional pages, to the town clerk; $39 to the municipality's general revenue accounts; and $110 to the state, of which $36 is paid into the community

investment account and $74 into the state's general fund. General Statutes § 49-10 (h). The $159 fee assessed in connection with MERS-related assignments and releases is allocated slightly differently: $32 to municipal general revenue accounts; $36 to the state's community investment account; and $91 to the state's general fund. General Statutes § 49-10 (h). By contrast, the $53 paid by other mortgagees for all recorded transactions continues to be allocated as follows: $12 for the first page ($10 plus $1 of the $3 fee pursuant to § 7-34a [d], plus $1 of the $40 fee pursuant to § 7-34a [e]), and $5 per additional page to the town clerk; $3 to the municipality for local capital improvement projects; and $38 to the state, of which $2 is dedicated to historic document preservation and $36 for community investment. See General Statutes § 7-34a (a) (1), (d) and (e).

The parties agree that the legislature adopted the amendments to § 7-34a (a) at least in part as a revenue enhancing measure to help balance the state budget. They also agree that there is no evidence that any member of MERS has discontinued its membership in the MERS system or halted or reduced its use of that system as a result of the 2013 amendments. Finally, the parties agree that, in most cases, the recording fees at issue will be collected from the borrowers at closing and not paid by MERS itself.

II

As an initial matter, we must address the dispute between the parties about whether the fees imposed by § 7-34a are more properly characterized as user fees or taxes. The state contends that the payments are more akin to taxes than user fees because the statute was enacted primarily to raise revenues for the state and its municipalities and because the lion's share of the fees incurred in connection with MERS-related transactions is allocated to the state's general fund, the state's community investment account, and municipal general revenue accounts, whereas only a small fraction of the fees is retained by the town clerks as compensation for the recording service. The plaintiffs, by contrast, contend that the fees, which are identified in the statute as recording "fees"; General Statutes § 7-34a; and are paid in exchange for a discrete service of benefit to the filer, are properly considered user fees. Courts in other jurisdictions that have considered the question in other contexts—e.g., for purposes of the federal tax injunction law, 28 U.S.C. § 1341 (2012)—have reached different conclusions as to whether a purported "fee" that generates more revenue than is needed to fund the service for which the fee is charged, with the surplus allocated to the government's general fund, constitutes a tax or a fee. Compare, e.g., *Empress Casino Joliet Corp.* v. *Balmoral Racing Club, Inc.*, 651 F.3d 722, 730 (7th Cir. 2011) (tax), with, e.g., *San Juan Cellular Telephone Co.* v. *Public Service Commission*, 967 F.2d 683,

686 (1st Cir. 1992) (fee). But see S. Wolfe, "Municipal Finance and the Commerce Clause: Are User Fees the Next Target of the 'Silver Bullet'?," 26 Stetson L. Rev. 727, 729 (1997) ("[r]ecent rulings by the [United States Supreme] Court suggest that the difference between user fees and taxes may be a distinction without a difference"). Because the payments at issue in this case are hybrids, bearing some indicia of both taxes and user fees, and because the parties have not fully briefed the issue, we will assume, solely for purposes of the present appeal, that we must apply the constitutional standards governing both taxes and fees.

### III

We now address the merits of the plaintiffs' various constitutional challenges,[6] beginning with the plaintiffs' claim that §§ 7-34a (a) (2) and 49-10 (h), by charging nominees such as MERS higher recording fees than other mortgagees, violate the equal protection guarantees of the state and federal constitutions.[7] We reject this claim.

"To prevail on an equal protection claim, a plaintiff first must establish that the state is affording different treatment to similarly situated groups of individuals. . . . [I]t is only after this threshold requirement is met that the court will consider whether the statute survives scrutiny under the equal protection clause." (Citation omitted; internal quotation marks omitted.) *Keane* v. *Fischetti*, 300 Conn. 395, 403, 13 A.3d 1089 (2011). For purposes of this case, we will assume without deciding that the similarly situated requirement is satisfied and proceed to consider whether the legislature was warranted in singling out the plaintiffs for disparate treatment. Cf. *City Recycling, Inc.* v. *State*, 257 Conn. 429, 449, 778 A.2d 77 (2001).

"When a statute is challenged on equal protection grounds, whether under the United States constitution or the Connecticut constitution, the reviewing court must first determine the standard by which the challenged statute's constitutional validity will be determined." (Internal quotation marks omitted.) *D.A. Pincus & Co.* v. *Meehan*, 235 Conn. 865, 875, 670 A.2d 1278 (1996). In the present case, to prevail on their equal protection claim, the plaintiffs must overcome a highly deferential standard of review. "If the statute does not [affect] either a fundamental right or a suspect class, its classification need only be rationally related to some legitimate government purpose . . . ." (Internal quotation marks omitted.) Id. This rational basis review test "is satisfied [as] long as there is a plausible policy reason for the classification . . . the legislative facts on which the classification is apparently based rationally may have been considered to be true by the government decisionmaker . . . and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational . . . ."

(Citations omitted; internal quotation marks omitted.) Id., 876.

"It is undisputed that the constitutionality of the taxation scheme at issue . . . must be analyzed under rational basis review because it neither implicates a fundamental right, nor affects a suspect class. Indeed, claims that taxation schemes violate the equal protection rights of those more heavily taxed are subject to an especially deferential rational basis review. The United States Supreme Court has explained that in taxation, even more than in other fields, legislatures possess the greatest freedom in classification. Since the members of a legislature necessarily enjoy a familiarity with local conditions [that a reviewing] [c]ourt cannot have, the presumption of constitutionality can be overcome only by the most explicit demonstration that a classification is a hostile and oppressive discrimination against particular persons and classes. . . . Accordingly, that court has repeatedly held that inequalities [that] result from a singling out of one particular class for taxation or exemption, infringe no constitutional limitation." (Citation omitted; internal quotation marks omitted.) *Markley* v. *Dept. of Public Utility Control*, 301 Conn. 56, 70, 23 A.3d 668 (2011); see, e.g., *Alabama Dept. of Revenue* v. *CSX Transportation, Inc.*,     U.S.    , 135 S. Ct. 1136, 1142–43, 191 L. Ed. 2d 113 (2015). "Similarly, this court consistently has held that the state does not violate the equal protection clause by singling out a particular class for taxation or exemption." *Markley* v. *Dept. of Public Utility Control*, supra, 71. Rather, "[t]he burden is on the one attacking the legislative arrangement to negative *every conceivable basis* [that] might support it." (Emphasis in original; internal quotation marks omitted.) *D.A. Pincus & Co.* v. *Meehan*, supra, 235 Conn. 876–77. The same deferential standards govern equal protection challenges to user fees. See, e.g., *United States* v. *Sperry Corp.*, 493 U.S. 52, 65, 110 S. Ct. 387, 107 L. Ed. 2d 290 (1989); *Kadrmas* v. *Dickinson Public Schools*, 487 U.S. 450, 462–63, 108 S. Ct. 2481, 101 L. Ed. 2d 399 (1988).

Turning to the case before us, we first consider whether the challenged statutes seek to accomplish a legitimate public purpose. The parties agree that one primary purpose of the legislature in imposing higher recording fees on mortgage nominees such as MERS was simply to raise additional revenues, either to compensate for fees allegedly lost as a result of the MERS business model or, more generally, to help balance the state's budget. It is well established that raising revenues is a legitimate purpose—often the primary purpose—of a tax or a fee. See *Harbor Ins. Co.* v. *Groppo*, 208 Conn. 505, 511, 544 A.2d 1221 (1988) (tax); *Eagle Rock Sanitation, Inc.* v. *Jefferson County*, United States District Court, Docket No. 4:12-CV-00100-EJL-CWD (D. Idaho November 22, 2013) (fee). Accordingly, the first prong of the test is satisfied.[8]

The dispute between the parties thus centers around the question of whether it is permissible for the legislature to impose a higher share of the state's revenue burden on nominees such as MERS than it does on other recording parties. That is to say, we must determine whether the disparate treatment imposed by §§ 7-34a (a) (2) and 49-10 (h) is rationally related to the goal of raising revenues and recouping lost fees.

Before considering whether the legislature had a rational basis for imposing higher recording fees on nominees such as MERS than on other mortgagees, we first address the plaintiffs' contention that we must restrict our analysis in this regard to those theories that the state raised before the trial court and that find evidentiary support in the record. The plaintiffs misstate the law. As the trial court properly recognized, the state "has no obligation to produce evidence to sustain the rationality of a statutory classification. [A] legislative choice is not subject to courtroom [fact-finding] and may be based on rational speculation unsupported by evidence or empirical data. . . . A statute is presumed constitutional . . . and [t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it . . . whether or not the basis has a foundation in the record." (Citations omitted; internal quotation marks omitted.) *Heller* v. *Doe ex rel. Doe*, 509 U.S. 312, 320–21, 113 S. Ct. 2637, 125 L. Ed. 2d 257 (1993). Indeed, it is well established that a reviewing court need not restrict its analysis even to those rationales proffered by the parties but may itself hypothesize plausible reasons why a legislative body might have drawn the challenged statutory distinctions. See, e.g., *Federal Communications Commission* v. *Beach Communications, Inc.*, 508 U.S. 307, 318, 113 S. Ct. 2096, 124 L. Ed. 2d 211 (1993); *Kadrmas* v. *Dickinson Public Schools*, supra, 487 U.S. 462–63; *American Express Travel Related Services Co*. v. *Kentucky*, 641 F.3d 685, 690 (6th Cir. 2011). In the present case, in light of the highly deferential standard of review that applies to tax and user fee legislation and other forms of purely economic regulation, we perceive at least two conceivable bases on which the legislature might reasonably have imposed higher recording fees on nominees such as MERS than on other mortgagees.

First, the legislature might simply have concluded that a large corporation such as MERS, which is involved in nearly two thirds of the nation's residential mortgage transactions, is better able to shoulder high recording fees than are smaller mortgagees. Although it is true that large banks, loan servicing companies, and other well-heeled mortgagees may be no less able to afford such fees, a statute subject to rational basis review can be under inclusive without running afoul of the equal protection clause. See, e.g., *Nordlinger* v.

*Hahn*, 505 U.S. 1, 11, 112 S. Ct. 2326, 120 L. Ed. 2d 1 (1992) ("[i]n structuring internal taxation schemes the [s]tates have large leeway in making classifications and drawing lines [that] in their judgment produce reasonable systems of taxation" [internal quotation marks omitted]); *Markley* v. *Dept. of Public Utility Control*, supra, 301 Conn. 70 ("[A] legislature is not bound to tax every member of a class or none. It may make distinctions of degree having a rational basis, and when subjected to judicial scrutiny they must be presumed to rest on that basis if there is any conceivable state of facts [that] would support it." [Internal quotation marks omitted.]); *Harbor Ins. Co.* v. *Groppo*, supra, 208 Conn. 511 ("[R]ecognizing that any plan of taxation necessarily has some discriminatory impact . . . we have previously stated the operative test for the validity of a tax statute to be the following: As long as some *conceivable* rational basis for the difference exists, a classification is not offensive merely because it is not made with mathematical nicety." [Citations omitted; emphasis in original; internal quotation marks omitted.]). Indeed, our sister state courts have upheld taxation schemes that impose a heightened burden on individual corporate taxpayers when there is a principled basis for doing so. See, e.g., *North Pole Corp.* v. *East Dundee*, 263 Ill. App. 3d 327, 336–37, 635 N.E.2d 1060 (1994); *Horizon Blue Cross Blue Shield* v. *State*, 425 N.J. Super. 1, 21–23, 39 A.3d 228 (App. Div.), cert. denied, 211 N.J. 608, 50 A.3d 41 (2012); see also *Verizon New England, Inc.* v. *Rochester*, 156 N.H. 624, 631, 940 A.2d 237 (2007) (city could tax one public utility more heavily than others if selective taxation was reasonably related to legitimate public interest).[9]

Second, as the trial court recognized, the legislature reasonably may have determined that mortgage assignments that typically would be recorded in the public land records are not recorded for loans registered with the MERS system because MERS remains the mortgagee of record for its members. Accordingly, the legislature could have raised the initial recording fee that MERS pays, as well as the final fee that is paid when the mortgage is released or transferred out of the MERS system, to compensate for the fees "lost" over the course of the life of the loan.

The plaintiffs offer four arguments in response: (1) there is no evidence in the record to support the contention that assignments are recorded less frequently for MERS loans than for other mortgagees' loans; (2) there is no legal requirement that assignments be recorded in the public land records; (3) even if town clerks do perform fewer recording duties with respect to MERS loans than non-MERS loans, there is no reason to compensate town clerks for lost recording revenues because they already save the costs associated with not having to record assignments of MERS loans, or, put differently, clerks are not entitled to payment for ser-

vices that they do not perform; and (4) even if town clerks have lost recording fees under the MERS system, there is no rational relationship between those losses and the fees imposed under §§ 7-34a (a) (2) and 49-10 (h) because those fees are primarily allocated to the state's general fund and to municipal accounts, rather than to the clerks themselves. We consider each argument in turn.

With respect to the plaintiffs' argument that there is no evidence in the record that mortgage assignments are recorded less frequently for MERS-listed loans than for non-MERS loans, we already explained that, under the rational basis test, our review is not limited to theories that the state has documented at trial or that have been subject to judicial fact-finding. Rather, courts may consider—and it is the plaintiffs who must debunk—any rationale that might plausibly have motivated the legislature. In the present case, it cannot be seriously suggested that the MERS model might not result in fewer recordings in the public land records, with concomitant cost savings to MERS and its users. Indeed, the plaintiffs' argument is undercut repeatedly by the amici supporting their own position. The amici comprising two bankers associations and a land title association represent, for example, that (1) prior to the advent of MERS, recording expenses added at least $30 to the cost of each loan, and sometimes substantially more, (2) MERS was devised "with an eye toward eliminating many of the unnecessary costs . . . associated with land title and recording issues," (3) assignments that typically were filed on the land records before the establishment of MERS are no longer required, (4) this reduced need for assignments results in lower title insurance and closing costs for both buyers and sellers using the MERS system, and (5) MERS "made the transfer of loans in the secondary market both cheaper and simpler."

The amici also direct our attention to scholarly literature concluding that MERS "reduces the need to pay additional recording fees associated with subsequent transfers of mortgage loans or mortgage loan servicing rights" and to an article published by a former senior executive officer of MERS predicting that, because MERS "eliminates the need to record later assignments in the public land records . . . MERS will save the mortgage industry $200 million a year by eliminating the need for many assignments. Because MERS should decrease the cost of servicing transfers, mortgage loan portfolios may begin to reflect a price difference if the loans are MERS registered." Moreover, "[w]hether [town recorders'] assignment revenues will drop [as a result] remains an open question." In light of these publicly available statements, we have no difficulty concluding that the legislature might reasonably have determined that parties to MERS-listed loans can obtain significant cost savings in recording fees over the life of

a loan and that, as a result, it is not unfair to ask them to pay higher recording fees at the outset and again when the mortgage ultimately is released or transferred out of the MERS system.

The plaintiffs' second argument, namely, that there is no legal requirement that assignments of loan servicing rights be recorded in Connecticut, is a red herring. It is clear from the above quoted statements that, when the plaintiffs represent that the MERS system "eliminates the *need* to record later assignments in the public land records"; (emphasis added); they refer not to any legal recording requirement but, rather, to the fact that, from a practical standpoint, loan assignments must be recorded if the holder is to perfect its security interest and to avoid potentially costly gaps in the chain of title.

Nor are we persuaded by the plaintiffs' third argument, namely, that the legislature had no legitimate reason to compensate town clerks for lost recording revenues because, if a document is not recorded, the town clerk has performed no service for which he or she deserves to be compensated. There are three flaws with this argument. First, the argument accounts for only the marginal costs associated with recording a document. The costs of running a town clerk's office, including the clerk's salary and benefits, building and utilities, information technology infrastructure, and the like, are largely fixed. By contrast, the marginal costs associated with recording any particular document—a bit of paper and ink, or the digital equivalents thereof—are quite limited. Thus, if increased use of the MERS system means that a clerk's workload drops by 10 percent, it is unlikely that the clerk's office will recognize a corresponding 10 percent cost savings. It therefore was reasonable for the legislature to impose higher up-front and back-end fees on MERS transactions to help the town clerks maintain budget stability.

Second, the plaintiffs fail to acknowledge that the service provided by a clerk's office only begins with the recording of a document. The principal service provided, and the principal value to the recording party, is that a record of the transaction is perpetually maintained and made available to the public for search by any interested party. This is the primary reason parties opt to record assignments and other loan documents. One value of the MERS system to subsequent transferees, then, is that it allows them essentially to free ride on the public recording system. They reap the benefit of MERS' initial recording as mortgagee, without having to pay—at least without having to pay the clerk—for the ongoing benefit of the public notice. It is reasonable to assume that the legislature imposed higher up-front recording fees on MERS loans as a way to remedy this free rider problem.

Third, the plaintiffs go astray in considering the issue solely from the standpoint of the town clerk. Regardless

of whether the clerks have lost money as a result of a lower recording rate for assignments of MERS loans, it seems clear that MERS, its members, and the buyers and sellers involved in MERS-listed transactions do achieve some savings in recording costs. If the legislature concluded that this system of loan processing results in significant cost savings for MERS members and its users, the legislature was free to impose a higher tax or fee on those transactions in order to recapture a portion of those savings. See *Rosemont* v. *Priceline.com, Inc.*, United States District Court, Docket No. 09 C 4438 (N.D. Ill. October 14, 2011) (equal protection clause was not offended when town imposed hotel tax on only those travel companies using distinct business model that otherwise would have resulted in tax savings for those companies); *Horizon Blue Cross Blue Shield* v. *State*, supra, 425 N.J. Super. 22–23 (equal protection clause was not offended when state imposed tax solely on health service companies, of which plaintiff was sole exemplar, which previously had advantage of certain tax loopholes).

Finally, the plaintiffs' fourth argument is that, even if town clerks have lost recording fees as a result of the MERS system, there is no rational relationship between those losses and the heightened fees imposed under §§ 7-34a (a) (2) and 49-10 (h), which primarily are allocated to the state's general fund and municipal accounts. This argument fails because, among other things, it assumes a system of municipal financing that is largely obsolete. Pursuant to General Statutes § 7-34b (b), "[a]ny town may, by ordinance, provide that the town clerk shall receive a salary in lieu of all fees and other compensation provided for in the general statutes . . . . Upon the adoption of such ordinance the fees or compensation provided by the general statutes to be paid to the town clerk shall be collected by such town clerk and he shall deposit all such money collected by him in accordance with such provisions of law as govern the deposit of moneys belonging to such town." On the basis of publicly available documents, the legislature reasonably could have concluded that only a handful of Connecticut towns still hew to the traditional model under which financially independent clerks' offices retain the recording fees they collect, and that, in most cases, such fees are now paid into a town's general revenues. See Office of Legislative Research, Connecticut General Assembly, Report No. 2006-R-0297, Town Clerks: Duties, Responsibilities, and Fee Collection (April 26, 2006). Accordingly, a falloff in recording fees will adversely impact municipal budgets and potentially result in a heightened need for local community support by the state. For these reasons, we conclude that the distinctions established by §§ 7-34a (a) (2) and 49-10 (h) are rationally related to legitimate public interests and, therefore, do not offend the equal protection provisions of the state or federal consti-

tution.

## IV

We next consider the plaintiffs' claim that §§ 7-34a (a) (2) and 49-10 (h) violate the dormant commerce clause of the federal constitution. The commerce clause provides that Congress shall have the power "[t]o regulate Commerce with foreign Nations, and among the Several States, and with the Indian Tribes . . . ." U.S. Const., art. I, § 8, cl. 3. "Although the [c]lause is framed as a positive grant of power to Congress, [the United States Supreme Court has] consistently held this language to contain a further, negative command, known as the dormant [c]ommerce [c]lause, prohibiting certain state [regulation] even when Congress has failed to legislate on the subject." (Internal quotation marks omitted.) *Comptroller of the Treasury* v. *Wynne*, U.S. , 135 S. Ct. 1787, 1794, 191 L. Ed. 2d 813 (2015). "[T]he dormant [c]ommerce [c]lause precludes [s]tates from discriminat[ing] between transactions on the basis of some interstate element. . . . This means, among other things, that a [s]tate may not tax a transaction or incident more heavily when it crosses state lines than when it occurs entirely within the [s]tate. . . . Nor may a [s]tate impose a tax [that] discriminates against interstate commerce either by providing a direct commercial advantage to local business, or by subjecting interstate commerce to the burden of multiple taxation." (Citations omitted; internal quotation marks omitted.) Id.

Although the recording transactions at issue in this case may themselves be purely local in nature, the presence of MERS as a participant indicates that many of the mortgage loans involved ultimately will be transferred on the national secondary loan market. For this reason, and in light of the unique role that MERS plays in the national secondary market, we will assume that interstate commerce is implicated. See *Camps Newfound/Owatonna, Inc.* v. *Harrison*, 520 U.S. 564, 573, 117 S. Ct. 1590, 137 L. Ed. 2d 852 (1997) ("if it is interstate commerce that feels the pinch, it does not matter how local the operation [that] applies the squeeze" [internal quotation marks omitted]).

We first consider what legal standard governs challenges to taxes and user fees under the dormant commerce clause. The plaintiffs, at varying times, suggest that the fees at issue in this case should be assessed according to the tests and legal analysis that the United States Supreme Court has applied to dormant commerce clause challenges against (1) general regulatory measures, (2) tax schemes, and (3) user fees. The plaintiffs may be forgiven for any confusion in this regard, however, as the United States Supreme Court's dormant commerce clause jurisprudence is less than a model of clarity, particularly in the area of user fees and general and special revenue taxes.[10] That court itself has acknowledged "the uneven course of [its] decisions in

this field"; *American Trucking Assns., Inc.* v. *Scheiner*, 483 U.S. 266, 269, 107 S. Ct. 2829, 97 L. Ed. 2d 226 (1987); and has indicated that its inability to settle on a guiding legal framework has created "a quagmire of judicial responses . . . ." (Internal quotation marks omitted.) Id., 280; see also S. Wolfe, supra, 26 Stetson L. Rev. 778–81 (discussing ambiguous state of law). Moreover, the high court's recent dormant commerce clause decisions have been decided by the narrowest of margins, with substantial disagreement among the members of that court as to the proper test or tests to be applied. See, e.g., *Comptroller of the Treasury* v. *Wynne*, supra, 135 S. Ct. 1791. As a result, several distinct but partially overlapping tests may be thought to govern the present case. See, e.g., id., 1802 (applying internal consistency test to income tax scheme); *Dept. of Revenue* v. *Davis*, 553 U.S. 328, 338–40, 128 S. Ct. 1801, 170 L. Ed. 2d 685 (2008) (general two part test governs all state regulations, including taxes, but different rules may govern taxes and fees imposed by state in its dual capacity as market participant and regulator); *Complete Auto Transit, Inc.* v. *Brady*, 430 U.S. 274, 279, 97 S. Ct. 1076, 51 L. Ed. 2d 326 (1977) (establishing four part test governing state taxes that impact interstate commerce); *Evansville-Vanderburgh Airport Authority District* v. *Delta Airlines, Inc.*, 405 U.S. 707, 716–17, 92 S. Ct. 1349, 31 L. Ed. 2d 620 (1972) (establishing three part test governing user fees and special revenue taxes); *Pike* v. *Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S. Ct. 844, 25 L. Ed. 2d 174 (1970) (establishing balancing test governing any facially neutral state regulation). As United States Supreme Court Justice Antonin Scalia recently lamented: "One glaring defect of the negative [c]ommerce [c]lause is its lack of governing principle. Neither the [c]onstitution nor our legal traditions offer guidance about how to separate improper state interference with commerce from permissible state taxation or regulation of commerce. So we must make the rules up as we go along. That is how we ended up with the bestiary of ad hoc tests and ad hoc exceptions that we apply nowadays . . . ." (Citations omitted.) *Comptroller of the Treasury* v. *Wynne*, supra, 1809 (Scalia, J., dissenting).

Fortunately, we need not wade into this quagmire or attempt to divine the precise standards by which the United States Supreme Court might judge the statutes at issue in this case. This is because the parties apparently agree that their dispute boils down to the question of whether two central criteria—criteria that reappear throughout the United States Supreme Court's various dormant commerce clause tests and frameworks—are satisfied. First, a state user fee or tax is presumed to violate the dormant commerce clause if it facially discriminates against interstate commerce. See, e.g., *United Haulers Assn., Inc.* v. *Oneida-Herkimer Solid Waste Management Authority*, 550 U.S. 330, 338, 127

S. Ct. 1786, 167 L. Ed. 2d 655 (2007). "In this context, discrimination simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter. . . . Discriminatory laws motivated by simple economic protectionism are subject to a virtually per se rule of invalidity . . . [that] can . . . be overcome [only] by a showing that the [s]tate has no other means to advance a legitimate local purpose . . . ." (Citations omitted; internal quotation marks omitted.) Id., 338–39. Second, a fee or tax that is facially neutral nevertheless may offend the dormant commerce clause if it has the practical effect of imposing a burden on interstate commerce that is disproportionate to the legitimate benefits. See, e.g., *Dept. of Revenue* v. *Davis*, supra, 553 U.S. 365 (Kennedy, J., dissenting). We consider each criterion.

## A

### Facial Discrimination

The plaintiffs first contend that the challenged statutes discriminate on their face against interstate commerce because they impose higher recording fees only on those transactions involving a mortgage nominee, such as MERS, that operates in conjunction with a national electronic database. The plaintiffs argue that there is no apparent justification for penalizing companies that operate *national* databases, as opposed to a hypothetical nominee operating a database that tracks only mortgage loans transferred between Connecticut-based entities or securing Connecticut-based properties. For this reason, they contend, §§ 7-34a (a) (2) and 49-10 (h) presumptively violate the dormant commerce clause. There are at least four problems with this argument.

First, although the plaintiffs correctly note that a statute can facially discriminate against interstate commerce even if it does not expressly favor in-state over out-of-state businesses; see *Healy* v. *Beer Institute*, 491 U.S. 324, 340–41, 109 S. Ct. 2491, 105 L. Ed. 2d 275 (1989); the United States Supreme Court nevertheless has emphasized that "[t]he central rationale for the rule against discrimination is to prohibit state or municipal laws whose object is local economic protectionism, laws that would excite those jealousies and retaliatory measures the [c]onstitution was designed to prevent." *C & A Carbone, Inc.* v. *Clarkstown*, 511 U.S. 383, 390, 114 S. Ct. 1677, 128 L. Ed. 2d 399 (1994); see also *Dept. of Revenue* v. *Davis*, supra, 553 U.S. 337–38 ("economic protectionism . . . designed to benefit in-state economic interests by burdening out-of-state competitors" is paradigmatic form of discrimination [internal quotation marks omitted]); *Healy* v. *Beer Institute*, supra, 326 (challenged statute ensured favorable pricing for residents of Connecticut and maintained competitiveness of Connecticut-based retailers); *Philadelphia* v. *New Jersey*, 437 U.S. 617, 624, 98 S. Ct. 2531, 57 L. Ed.

2d 475 (1978) ("[t]he crucial inquiry . . . must be directed to determining whether [the challenged statute] is basically a protectionist measure, or whether it can fairly be viewed as a law directed to legitimate local concerns, with effects [on] interstate commerce that are only incidental"). In the present case, there is no indication that the legislative choice to impose higher fees on nominees—whether in state or out of state—who operate national mortgage databases reflected an invidious discrimination against out-of-state interests, or an effort to favor Connecticut-based financial companies. If anything, the opposite is true, as the likely result will be that Connecticut homeowners, who, the parties agree, typically absorb the higher upfront fees for MERS-listed loans, will subsidize out-of-state banks and government sponsored financing corporations or their agents, who, upon acquiring the loans in the secondary market, will receive the benefits of recordings in the public land records without having to pay the associated costs. See *United Haulers Assn., Inc.* v. *Oneida-Herkimer Solid Waste Management Authority*, supra, 550 U.S. 345.

Nor do we believe that the hypothetical favored mortgage nominee the plaintiffs conjure up—one that operates a Connecticut only electronic database—is anything other than a chimera. Because the secondary residential mortgage market is national in scope and is dominated by federal agencies that are located outside of this state, there would be no reason for a company to invest in an electronic registration system that tracks only loan transfers between Connecticut investors, or only loans issued in connection with Connecticut-based properties.[11] The plaintiffs do not contend that any such competitor currently exists or is likely to emerge in the foreseeable future. As the Supreme Court explained in *Associated Industries* v. *Lohman*, 511 U.S. 641, 114 S. Ct. 1815, 128 L. Ed. 2d 639 (1994), "[it has] never deemed a hypothetical possibility of favoritism to constitute discrimination that transgresses constitutional commands." Id., 654; see also *Exxon Corp.* v. *Governor*, 437 U.S. 117, 125, 98 S. Ct. 2207, 57 L. Ed. 2d 91 (1978) (disparate treatment claim was meritless when state's entire gasoline supply flowed in interstate commerce).

Second, notwithstanding the statutory reference to national electronic databases; General Statutes § 7-34a (a) (2) (C); we do not interpret the challenged statute to be a facial attack on interstate commerce. Rather, the record suggests—and the plaintiffs conceded at oral argument—that the language in question appears in § 7-34a only because the legislature cut and pasted it from MERS' own corporate documents describing the company's business model. In other words, the legislature's apparent intent was not to impose higher recording fees on residential mortgage transactions with a national character but, rather, merely to indicate that the higher fees are directed at MERS and any other mortgage nom-

inees that may develop virtual recording systems to facilitate transactions in the secondary mortgage market. It is only because that market, like many modern financial markets, happens to be national in scope that the "national electronic database" language found its way into § 7-34a.[12] Both this court and the United States Supreme Court have emphasized in this regard "the importance of looking past the formal language of [a] tax statute [to] its practical effect . . . ." (Internal quotation marks omitted.) *Chase Manhattan Bank* v. *Gavin*, 249 Conn. 172, 210, 733 A.2d 782, cert. denied, 528 U.S. 965, 120 S. Ct. 401, 145 L. Ed. 2d 312 (1999); accord *Quill Corp.* v. *North Dakota ex rel. Heitkamp*, 504 U.S. 298, 310, 112 S. Ct. 1904, 119 L. Ed. 2d 91 (1992). As we discuss hereinafter, we perceive no deleterious effect of the challenged legislation on the national secondary mortgage market.

Third, the United States Supreme Court has explained that "a fundamental element of dormant [c]ommerce [c]lause jurisprudence [is] the principle that any notion of discrimination assumes a comparison of substantially similar entities." (Internal quotation marks omitted.) *Dept. of Revenue* v. *Davis*, supra, 553 U.S. 342. As we explained in part III of this opinion, MERS is not substantially similar to other mortgagees—even other mortgage nominees—with respect to the roles they play in Connecticut's residential mortgage recording market. Whereas traditional mortgagees are primarily lenders or loan servicing companies, MERS is identified as a mortgagee in the public land records as a sort of placeholder, indicating to interested parties that the recent chain of title to a MERS-listed property may be traced by consulting the MERS database. Accordingly, the statutes do not facially discriminate against interstate commerce. Rather, they simply recognize that MERS, which uses the public land records as a means of enhancing the value that its member companies obtain from its electronic registration services, may realize a distinct and greater benefit from recording its interests than do other mortgagees.

Fourth, and relatedly, even if we believed that the statutes in question discriminated against interstate commerce, we would conclude, for reasons discussed in part III of this opinion, that there is no constitutional violation because such discrimination advances a legitimate local purpose. See, e.g., *Camps Newfound/Owatonna, Inc.* v. *Harrison*, supra, 520 U.S. 581. It is well established that interstate commerce can be made to "pay its way" under a state regulatory scheme without running afoul of the dormant commerce clause. (Internal quotation marks omitted.) *Commonwealth Edison Co.* v. *Montana*, 453 U.S. 609, 616, 101 S. Ct. 2946, 69 L. Ed. 2d 884 (1981). In the present case, to the extent that the purpose of the challenged legislation was merely to recoup from MERS the recording fees that its members otherwise would have paid upon the trans-

fer of a mortgage in the secondary market, §§ 7-34a (a) (2) and 49-10 (h) represent a legitimate attempt to level the playing field between MERS members and nonmembers and to ensure that recording revenues are not lost as a result of MERS' novel business model. For all of the foregoing reasons, we agree with the state that the statutes do not discriminate impermissibly against interstate commerce.

## B

### Undue Burden

We next consider the plaintiffs' claim that the challenged statutes place an undue burden on the national secondary mortgage market. Their argument appears to be that, despite the dearth of any evidence that the increased fees have adversely impacted MERS' business or the secondary mortgage market in general, the simple fact that the state receives more than $5 million per year in increased fees on MERS-related transactions is, ipso facto, proof that interstate commerce has been burdened. The plaintiffs further contend that, because both the costs to the state and the benefits to the filers are the same for the recording of MERS and non-MERS transactions, but MERS is forced to pay fees that are approximately three times higher than other mortgagees, the costs imposed are necessarily disproportionate to the benefits. We are not persuaded.

The amount of a tax or user fee is presumed to be appropriate; S. Wolfe, supra, 26 Stetson L. Rev. 739; and the plaintiffs must demonstrate that the burdens imposed on interstate commerce *clearly* outweigh the benefits. See, e.g., *Dept. of Revenue* v. *Davis*, supra, 553 U.S. 353. As we explained in part III of this opinion, we are not convinced that either the costs or the benefits of recording a MERS-listed mortgage are the same as for any other mortgagee. Let us assume that a hypothetical non-MERS thirty year mortgage loan is transferred to a different lender every ten years during the life of the loan and that each subsequent holder records its interest in the public land records. Under that scenario, the original lender's recording fees would afford it the benefit of ten years of public notice of its interest in the property, and the clerk's office would receive three recording fees—the initial one and the fees for two assignments—to subsidize its costs of operation over the term of the loan, not including the release when the loan is fully repaid. Under the same circumstances, however, MERS and its members would continue to receive the benefit of the initial filing fee for the entire thirty year term of the loan, regardless of the number of intervening assignments among MERS members, and the clerk's office will be correspondingly poorer. See S. Wolfe, supra, 742 (noting that length of use of public service "strongly affects cost"); id., 744 (noting importance of intangibles in calculating value of public service and that continued consumer use suggests that

fees are not disproportionate to value provided). Accordingly, we cannot say that imposing higher front-end and back-end fees on MERS transactions in order to compensate for the reduced number of recorded mortgage assignments imposes an undue burden on MERS or, by extension, interstate commerce. See *Associated Industries* v. *Lohman*, supra, 511 U.S. 647 (interstate and intrastate transactions may be taxed differently, as long as ultimate burdens are comparable).

The United States Supreme Court also has suggested that, in gauging the burdens imposed on interstate commerce, a reviewing court should consider whether, if every state were to adopt the challenged policy, the result would be to "place interstate commerce at a disadvantage as compared with commerce intrastate." (Internal quotation marks omitted.) *Comptroller of the Treasury* v. *Wynne*, supra, 135 S. Ct. 1802. In the present case, even if every state were to charge $106 extra to record MERS-listed mortgages in its corresponding land records, there is nothing in the record to suggest that those higher fees, taken together, would unduly burden interstate commerce. There is no indication that higher recording fees would so overshadow the benefits of participation in a national electronic registration system that borrowers and lenders would opt not to participate in MERS or that the vitality of the secondary mortgage market would be compromised. The parties have agreed that higher fees have not resulted in a loss of MERS business within this state, and there is no reason to believe the outcome would differ elsewhere, or nationally. Nor is there any evidence of (1) what share of the estimated $5.4 million that the state will receive in additional annual recording fees will be borne by MERS and its members, and how that amount compares to the annual profits on their residential mortgage lending business in Connecticut, (2) what share of the increased fees will be borne by borrowers, and what impact those fees will have on their total closing costs, or (3) what cost savings MERS, its members, and borrowers in MERS-related transactions have achieved as a result of the MERS system. We are mindful in this regard of the United States Supreme Court's recent guidance that the judiciary is particularly ill-suited to making the sorts of complex predictions and subtle cost-benefit calculations necessary to assess whether a particular tax scheme is unduly burdensome. See *Dept. of Revenue* v. *Davis*, supra, 553 U.S. 355.

In *Davis*, the United States Supreme Court also cautioned that a court "should be particularly hesitant to interfere . . . under the guise of the [c]ommerce [c]lause [when] a [state or] local government engages in a traditional government function," of which the maintenance of public land records is clearly an example. (Internal quotation marks omitted.) Id., 341, quoting *United Haulers Assn., Inc.* v. *Oneida-Herkimer Solid Waste Management Authority*, supra, 550 U.S. 344. In

light of this guidance, and given the parties' stipulation that the legislation at issue has not redounded to the tangible detriment of the MERS business model, we are compelled to defer to the legislature's judgment that the fees at issue represent a reasonable approximation of the savings in recording costs generated by use of the MERS system. Accordingly, §§ 7-34a (a) (2) and 49-10 (h) do not offend the dormant commerce clause,[13] and we reject the plaintiffs' claim to the contrary.[14]

The judgment is affirmed.

In this opinion the other justices concurred.

[1] We hereinafter refer to the defendants collectively as the state.

[2] The plaintiffs appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

The plaintiffs have not appealed from the trial court's ruling that the challenged statutes do not offend the takings provisions of the federal and state constitutions, and, accordingly, those claims are not before us.

We granted permission for two groups to file amicus curiae briefs: the Connecticut Bankers Association, Connecticut Mortgage Bankers Association, and American Land Title Association; and the Jerome N. Frank Legal Services Organization and the Connecticut Fair Housing Center.

[3] For the sake of brevity, in this opinion, we use the term MERS to refer to (1) the electronic recording system, (2) the entities that are the plaintiffs in this case, in their capacity as operators of the MERS system, and (3) the general model according to which changing legal interests in residential mortgages and mortgage loans are recorded in the MERS system.

[4] The state interprets § 7-34a (a) (2) (B) to mean that, in addition to the $159 recording fee, a nominee of a mortgagee filing an assignment or release under that subparagraph must pay $10 for the first recorded page and $5 for each additional page pursuant to § 7-34a (a) (1). The plaintiffs contend that it is unclear whether town clerks are permitted to charge these additional fees, in light of the statement in § 7-34a (a) (2) (B) that "[n]o other fees shall be collected from the nominee for such recording." For purposes of this appeal, because we glean from the state's brief that these additional fees are in fact being imposed on the plaintiffs, and that they are therefore a subject of the plaintiffs' complaint, we assume without deciding that the statute authorizes such additional fees.

[5] See footnote 4 of this opinion.

[6] Because a challenge to the constitutionality of a statute presents a question of law, our review is plenary. E.g., *Keane* v. *Fischetti*, 300 Conn. 395, 402, 13 A.3d 1089 (2011). We recognize, however, that legislation that structures and accommodates the burdens and benefits of economic life carries a strong presumption of constitutionality. See, e.g., *Schieffelin & Co.* v. *Dept. of Liquor Control*, 194 Conn. 165, 186, 479 A.2d 1191 (1984).

[7] The equal protection clause of the fourteenth amendment to the United States constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., amend. XIV, § 1. Article first, § 20, of the constitution of Connecticut provides in relevant part: "No person shall be denied the equal protection of the law . . . ." Neither party contends that the state and federal constitutional analyses diverge with respect to equal protection challenges to tax and fee statutes. Accordingly, for purposes of this case, we treat the relevant state and federal protections as coextensive. See, e.g., *Keane* v. *Fischetti*, 300 Conn. 395, 403, 13 A.3d 1089 (2011).

[8] The plaintiffs also contend that the amendments to §§ 7-34a and 49-10 were motivated by an impermissible desire to punish MERS for its business model. The trial court rejected this allegation, and we find no support for it in the legislative history. Even if it were true, however, the outcome of our analysis would be no different. As long as the challenged distinction is rationally related to some legitimate public purpose that conceivably may have motivated the legislature, it is irrelevant whether certain legislators also may have been motivated by animus toward the plaintiffs. See, e.g., *United States* v. *O'Brien*, 391 U.S. 367, 383–84, 88 S. Ct. 1673, 20 L. Ed. 2d 672 (1968); see also *Wisconsin Education Assn. Council* v. *Walker*, 705 F.3d 640, 653 (7th Cir. 2013).

[9] The equal protection cases on which the plaintiffs rely are readily distin-

guishable, as they primarily address legislative distinctions that (1) implicate federalism or other constitutional interests, (2) are transparently arbitrary and without rational basis, or (3) impose criminal or quasi-criminal sanctions. See, e.g., *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U.S. 432, 449–50, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985) (in rare case in which United States Supreme Court held that challenged social legislation failed to withstand rational basis review, court concluded that irrational fear of mentally disabled individuals did not justify discriminatory zoning ordinance); *Williams* v. *Vermont*, 472 U.S. 14, 23, 105 S. Ct. 2465, 86 L. Ed. 2d 11 (1985) (state impermissibly discriminated against nonresidents); *Zobel* v. *Williams*, 457 U.S. 55, 64, 65, 102 S. Ct. 2309, 72 L. Ed. 2d 672 (1982) (apportioning state benefits on basis of duration of residency would impermissibly divide citizens into castes and unduly infringe interstate travel rights); *James* v. *Strange*, 407 U.S. 128, 138–39, 92 S. Ct. 2027, 32 L. Ed. 2d 600 (1972) (statute imposed "unduly harsh or discriminatory terms" on indigent criminal defendants and potentially infringed right to counsel); *City Recycling, Inc.* v. *State*, supra, 257 Conn. 453 (trial court's specific factual findings "directly negate[d] every conceivable rational basis for the legislation"); *State* v. *Reed*, 192 Conn. 520, 531–32, 473 A.2d 775 (1984) (quasi-penal statute imposing liability for hospital care expenses on certain confined individuals but not others was deemed to be "entirely arbitrary"); *Caldor's, Inc.* v. *Bedding Barn, Inc.*, 177 Conn. 304, 316–18, 417 A.2d 343 (1979) (applying stricter standard in case of penal statute); see also *Allegheny Pittsburgh Coal Co.* v. *County Commission*, 488 U.S. 336, 345, 109 S. Ct. 633, 102 L. Ed. 2d 688 (1989) (county assessor failed to comply with uniform state tax policy).

[10] Because the statutory scheme at issue in this case allocates a portion of the nominee filing fees to the state's general fund and municipal accounts, and a portion to the town clerks and the state's community investment account, the fees have characteristics of both general and special revenue taxes.

[11] To the extent that they suggest otherwise, the plaintiffs place the cart before the horse. The amici consisting of the bankers associations and the land title association, who support the plaintiffs' position in this case, have presented scholarship indicating that it was the national mortgage lending industry and government sponsored financing corporations such as Fannie Mae and Freddie Mac that partnered to create MERS to fill the need for a central registry for the national residential mortgage industry. See R. Arnold, "Yes, There Is Life on MERS," 11 Prob. & Prop. 33, 33 (1997); see also P. Sargent & M. Harris, "The Myths and Merits of MERS" (September 25, 2012). From its very inception, then, the MERS business was necessarily national in scope.

[12] Although the plaintiffs suggest in their reply brief that the statutes bespeak a legislative intent to punish MERS for transacting business outside of Connecticut, there is no evidence in either the record of this case or the legislative history to support such a suggestion.

[13] It might also be argued that, insofar as the state's purpose in imposing higher recording fees on MERS-listed mortgages is to prevent a competitor in the mortgage recording business from free riding on its public recording system, the state acts as a market participant—as well as a regulator—with respect to MERS and, therefore, is immune from challenge under the dormant commerce clause. See, e.g., *Dept. of Revenue* v. *Davis*, supra, 553 U.S. 339; *SSC Corp.* v. *Smithtown*, 66 F.3d 502, 510–12 (2d Cir. 1995), cert. denied, 516 U.S. 1112, 116 S. Ct. 911, 133 L. Ed. 2d 842 (1996); see also *McBurney* v. *Young*,      U.S.      , 133 S. Ct. 1709, 1720, 185 L. Ed. 2d 758 (2015) (state, having created market by offering program, does not offend dormant commerce clause by restricting access to that market so as to favor local interests). Because neither party has raised this argument, however, we need not consider it.

[14] On appeal, the plaintiffs also contend that enforcement of the challenged statutes violates their substantive due process rights under the federal and state constitutions, the federal constitutional prohibition against bills of attainder, and 42 U.S.C. § 1983. We have reviewed these claims and, for essentially the same reasons that we rejected the equal protection and commerce clause claims, we find them to be without merit.